### FERGUSON & CO. v. RICKETTS.

### In re LINCOLN TRUST CO.

### No. 10410.

Circuit Court of Appeals, Eighth Circuit.
Feb. 11, 1936.

Frank D. Williams, of Lincoln, Neb. (Earl Cline, of Lincoln, Neb., on the brief), for appellant.

R. A. Boehmer, of Lincoln, Neb. (F. C. Boehmer, of Lincoln, Neb., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

Ferguson & Co., a corporation, petitioned the bankruptcy court to compel the trustee in bankruptcy of the Lincoln Trust Company to turn over to it a note and mortgage valued at $7,000.00 then in the possession of the trustee in bankruptcy among the assets of the bankrupt estate and referred to in these proceedings as the Spurrier mortgage. Ferguson & Co. alleged that it had delivered the Spurrier mortgage and assignment thereof to the president of the Lincoln Trust Company on or about April 14, 1932, to hold the same in trust and to deliver the same to the Lincoln Trust Company as part payment upon the petitioner's subscription for the purchase of preferred stock to be issued by the trust company when it should be reorganized. The petitioner alleged that the trust company was never reorganized and the preferred stock was never authorized or issued, so that petitioner remained the owner of the Spurrier mortgage, entitled to recover it from the trustee in bankruptcy.

Upon the hearing of the petition before the referee in bankruptcy, it appeared that Ferguson & Co. had offered the Spurrier mortgage to the Lincoln Trust Company on April 14, 1932, for preferred stock to be issued upon a reorganization of the company, and that the reorganization had not been accomplished and no preferred stock had been issued. But it was also shown that this delivery of the Spurrier mortgage to the trust company, made with the offer to apply it on the purchase of preferred stock, was not the first delivery of the mortgage made by Ferguson & Co. to the trust company. The trustee in bankruptcy predicated no rights to the mortgage thereon. The proof was that Ferguson & Co. had delivered the mortgage together with 40 shares of stock in the Gooch Milling & Elevator Company to the Lincoln Trust Company in January of 1931, long before the attempted reorganization of the trust company, and had at the time of such prior delivery authorized the trust company to sell the securities and apply the proceeds up-

on a subscription obligation in the amount of $10,000 incurred by Ferguson & Co. on November 28, 1931. Later, on about April 2, 1932, Mr. R. L. Ferguson, vice president of Ferguson & Co., had obtained possession of the securities from the trust company without any part of the $10,000 obligation having been paid. But it appeared that Mr. Ferguson was a director of the Lincoln Trust Company at the time he took out the securities, and there was no consideration for the delivery of them to him except that he was going to effect the sale of them for the purposes for which they were held by the trust company. He made a sale of the Gooch Milling Company stock, and the proceeds were retained to the use of Ferguson & Co., but the Spurrier mortgage was not sold. The trustee in bankruptcy claimed that the lien resulting from the pledge of the securities to the Lincoln Trust Company had not been affected by Mr. Ferguson's removal of them and that the trustee in bankruptcy was entitled to an order for restoration of the Gooch Milling Company stock as well as to an order to sell the Spurrier mortgage to apply upon the lien.

It appeared that in the fall of 1932 the Lincoln Trust Company was in great need of money, and its officers and stockholders made strenuous efforts to get contributions to meet its requirements. The company owned, among other things, some 2,000 acres of encumbered Iowa lands and a second mortgage for $105,000 upon the Orpheum Theatre building in East St. Louis, Ill., and it proposed to devote these assets to raise the needed funds. It was essential to the maintenance of the company's credit that it should not assume a new debt or liability. Accordingly, on the advice of counsel, the company did not solicit the contributions from its stockholders in the form of a loan to be secured by the assets referred to, but it agreed to sell the assets outright, reserving to itself the right to repurchase the property on or before December 31, 1934, for a sum sufficient to repay the contributors the amounts of their contributions, together with 7 per cent. interest up to the date of repurchase. On these terms various stockholders of the trust company, including Ferguson & Co., signed subscriptions in writing aggregating $50,000 to be used in the purchase of the described assets from the trust company.

The subscription agreement, omitting description of the property, was in words and figures as follows:

"For valuable consideration including the agreement of other parties hereto, we the undersigned, hereby severally agree to pay to J. A. Reichenbach, Paul H. Holm, and R. L. Ferguson as trustees with right of survivorship, the sum of money set opposite our respective signatures hereunder upon demand of said trustees. Said money is to be used by said trustees in purchasing from Lincoln Trust Company of Lincoln, Nebraska, for not to exceed $75,000.00 the following real and personal property to-wit; * * * providing said Trust Company shall have the right to repurchase said property on or before December 31, 1934, for the purchase price together with interest computed at the rate of 7 per cent semi-annually less the net receipts from said property, which shall be credited upon said purchase price at the time received. That is to say, the Trust Company shall be required to pay only such sum for the repurchase of said property as will be necessary to repay the subscribers hereto their principal together with 7 per cent interest on the unpaid balance thereof up to the date of such repurchase.

"Dated this 28th day of November, 1931."

All of the subscribers paid their subscriptions, except Ferguson & Co., and the trust company received on account of such payments $40,000 instead of the total subscribed. The amount subscribed by Ferguson & Co. was $10,000, but, as stated by Mr. Ferguson, "We were unable to raise the money." Being unable to pay the amount subscribed by it, Ferguson & Co. delivered the Spurrier mortgage and the Gooch Milling Company stock to the Lincoln Trust Company on January 13, 1932, and accepted a receipt signed by the trust company which recites that the securities "are held in connection with the subscription made by said Ferguson & Company dated November 28th, 1931." Later, on January 19, 1932, an assignment in blank of the Spurrier mortgage was sent by Mr. Ferguson to the trust company in a letter reciting: "This (the Spurrier mortgage) is the mortgage which you are to sell for us if possible, the proceeds to be applied on the loan which we are making the Company along with others." The transaction between the Lincoln Trust Company and those who subscribed $50,000 to be used in the purchase of the described property was, as stated, not a loan. There was no agreement, express or implied, requiring the trust company to repay the money or any part of it. But, as there was an option reserved to the company to repurchase its property by paying principal and interest to the subscribers, it was not unnatural for Ferguson & Co. to thus refer loosely to the transaction as a loan.

The Lincoln Trust Company duly transferred and delivered the Iowa lands and the Orpheum Theatre building mortgage to the trustees for the use and benefit of those stockholders who had made subscriptions therefor, and at the date of the hearing the time which the trust company had reserved for redemption of its transferred assets had long since expired.

The referee found specifically that Ferguson & Co. had along with others agreed to purchase the trust company's Iowa lands and its Orpheum Theatre building second mortgage, and that among the considerations agreed to be paid was the subscription for $10,000 pledged by Ferguson & Co. in the agreement of November 28, 1931; that Ferguson & Co. had delivered its Gooch Milling Company stock and the Spurrier mortgage to the Lincoln Trust Company for the purpose of having them sold and applied upon the $10,000 pledge; that the Lincoln Trust Company surrendered, transferred, and deeded its Iowa lands and Orpheum Theatre building mortgage in pursuance of the purchase agreement and in reliance, among other things, upon the pledge of Ferguson & Co.; that Ferguson & Co. has never complied with its contract to make contribution with the others, and it is still indebted on account thereof in the sum of $10,000. He therefore ordered the trustee in bankruptcy to bring a plenary action for the recovery of the Gooch Milling Company stock, and he further ordered the trustee to sell the Spurrier mortgage to apply upon the $10,000 indebtedness.

A review of the referee's order was had in the District Court; the order was affirmed; and Ferguson & Co. appeals.

It contends that its subscription of November 28, 1931, to pay $10,000 to be used in purchasing the Iowa lands and Theatre building mortgage from the trust company was so worded as to obligate it only

to the trustees named in the subscription and not to the trust company; that the trustees (of whom Mr. Ferguson was one) were not making any claim and were not parties to the proceedings; that, as Ferguson & Co. were not obligated to the trust company, there was no consideration for any pledge of the Spurrier mortgage and the Gooch Milling Company stock to the trust company; but Ferguson & Co. merely delivered the securities to the trust company as agent to make sale of them.

It is true that the wording of the subscription agreement is that the subscribers agree to pay the amounts subscribed "to the trustees" and that the money subscribed "is to be used by them in purchasing" the property from the Lincoln Trust Company "for not to exceed $75,000.00." So that, if the language stood alone in a vacuum, it might have been arguable that the signers were contemplating that the trustees they named should use their judgment to buy the described property for investment or speculation on the best terms they could get for the profit of the subscribers. But the circumstances make it clear that such an interpretation would pervert the purposes of the parties. The officers and stockholders of the Lincoln Trust Company were not in the market to buy up the assets of the trust company in the ordinary attitude of property buyers. Their purpose was to obtain contributions of money for the company, as much as they could secure subscriptions for upon the property offered by the company, limited only by the provision inserted for the protection of the subscribers that the amount was not to exceed $75,000. As Mr. Ferguson testified: "We were out trying to get money to try to keep the company going." "What we were trying to do was to get enough money for the Company to save its life." And Mr. Carlson said: "The intention was that all that money (the subscriptions) was to be paid to the (Lincoln Trust) Company." And the circumstances forbid interpreting the subscription contract as though it was intended to confer power on the named trustees to dicker with the trust company for a low price on the property or as though it conferred discretion on them to withhold from the company any of the subscriptions that they were able to obtain up to $75,000. No such thought appears to have been in the minds of any of the parties. All the signers of the subscription agreement were contributing to the company to meet its necessities. The trustees were merely a convenient conduit to receive the subscriptions and the money and to convey the same to the company and to receive the legal title to the property. The real parties beneficially interested were the trust company and the subscribers. This relationship was recognized by Ferguson & Co., when, finding itself unable to pay its subscription, it dealt directly with the trust company and turned over the Spurrier mortgage and the milling company stock to be sold and the proceeds applied on the $10,000 debt. It does not appear that the trustees named in the subscription agreement had any objection to the direct dealing between Ferguson & Co. and the trust company. The evidence is that the trust company made out to the trustees, and they accepted, a conveyance of all the property specified in the subscription agreement and all of the money of the subscribers who paid their subscriptions went, as intended, to the trust company, while Ferguson & Co., the only subscriber which did not pay, delivered its securities to the trust company to be sold and the proceeds applied to the payment of the subscription. The securities which Ferguson & Co. delivered to the Trust Company were worth more than the subscription for which it had obligated itself, and it was Mr. Ferguson's act of taking the securities out of the trust company which alone has occasioned controversy.

We think it very clear that the act of Mr. Ferguson did not operate to divest the trust company of its interest in the Spurrier mortgage or of its right to sell the same and apply the proceeds upon the subscription of Ferguson & Co. Hamburg Bank et al. v. Ouachita Nat. Bank in Monroe (C.C.A.) 78 F.(2d) 100.

The appellant contends that under the wording of the subscription contract the trust company could not have sued Ferguson & Co. thereon, and that it would have been necessary for the trustees to bring the suit for the benefit of the trust company. It has cited, among other cases, Second National Bank v. Grand Lodge, 98 U.S. 123, 25 L.Ed. 75; German Alliance Insurance Co. v. Home Watersupply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195, 42 L.R.A.(N.S.) 1000; Utah-

18

Idaho Live Stock Loan Co. v. Blackfoot City Bank (D.C.) 290 F. 588. The question is not open to the appellant, because Ferguson & Co. did not wait to be sued or coerced. It recognized its obligation to the trust company, and voluntarily turned over to the trust company the securities to be sold and applied to the debt. The trust company, on its part, transferred and conveyed its property and lands pursuant to the subscription agreements, and there are no grounds to justify the restoration of the securities to Ferguson & Co. while its subscription obligation remains unpaid.

Appellant also submitted testimony that the trustees named in the subscription agreement, other than Mr. Ferguson himself, had refused to accept the Spurrier mortgage in discharge of the subscription obligation of Ferguson & Co. One of the trustees said that, until Ferguson & Co. paid the amount of its subscription, it could not participate in the property purchased from the trust company. It is argued that, even if the Spurrier mortgage is sold and the proceeds applied as ordered by the referee, appellant will have a doubtful lawsuit with the trustees under the agreement of November 28, 1931, to establish any right in the Iowa land or the Theatre building mortgage.

It was not shown that the trustees had declared any dividend or distribution to the beneficiaries of their trust and had denied Ferguson & Co. the right to share therein. The evidence merely reflects that the trustees consider Ferguson & Co. bound to pay $10,000 according to the promise made by it, and that they intend to coerce payment if they can. That attitude suggests no reason why the court should have relieved Ferguson & Co. of its obligation.

The appellant offered no evidence tending to show that the trust company got, or expected to get, any other or different consideration for its property than the subscriptions made therefor. No act or declaration of the trustees indicates any attempt on their part to withhold from the trust company any subscription they had obtained. Ferguson & Co. agreed to pay $10,000, and the evidence sustains the findings and conclusions of the referee and the District Court that Ferguson & Co. should be held to pay, as did its cosubscribers.

The decree is affirmed.