**Dennis FOUNTAIN, Plaintiff,**

v.

**CITY OF WAYCROSS, GEORGIA, Defendant.**

**No. CV588–013.**

United States District Court, S.D. Georgia, Waycross Division.

Aug. 5, 1988.

Fletcher Farrington, Louisa Abbot, Savannah, Ga., for plaintiff.

Terry L. Readdick, David C. Will, Brunswick, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

Plaintiff Dennis Fountain is a white police officer for the City of Waycross, Geor-

gia. He alleges that he was denied equal protection of the law when a black police officer was promoted instead of him to the rank of sergeant pursuant to an affirmative action plan adopted by the City of Waycross. Before the Court are cross-motions for summary judgment.

## I. *Background*[1]

The City of Waycross has a stated general policy of promoting or advancing its employees on the basis of merit. Consistent with this policy, the city is authorized to develop "a suitable examination program for any class of positions," which examination program "must be validated as to its ability to test for job performance."

Chief of Police W. Lynn Taylor implemented in 1981 a process for competitive promotions to the rank of sergeant. All police officers who have completed two continuous years of satisfactory service and have satisfactorily completed a physical fitness examination are eligible to compete in the promotional process.

The promotional process involves consideration of the following criteria: (1) an applicant's score on a written examination; (2) an oral interview; (3) a record evaluation; and (4) consideration of longevity. The four criteria are weighted as follows:

Written Examination . . . . . . . . . . . . . . . . 50%

Oral Interview . . . . . . . . . . . . . . . . . . . . . . 20%

Record Evaluation . . . . . . . . . . . . . . . . . . . 25%

Longevity . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%

Based on these component criteria, a composite score is tabulated for each applicant, and the ranked scores of each applicant are posted on a bulletin board in the police department.

The City of Waycross promoted twelve officers to the rank of sergeant between 1976 and 1984. During that period, the persons promoted were those who scored highest, or near the highest, in the promotional process. Three promotions to the rank of sergeant were made in 1984; those were the last promotions made before the promotion which is the subject of this dispute.

Plaintiff Dennis Fountain was hired by the Waycross Police Department in 1979. In 1981 he resigned from the Department, but was rehired a month later. He first became eligible to compete in the promotional process in the latter half of 1984, and has competed every time the examination has been offered since that time. The promotional process is conducted twice yearly; however, promotions are made only sporadically. Mr. Fountain has always scored either first or second highest, but has never been promoted.

On the promotional process competition for the second half of 1987, plaintiff's composite score was 76.5. His score was the highest among nine candidates. On September 1, 1987, Chief Taylor announced that another candidate, Issac Whitfield, who is black, had been promoted to the rank of sergeant. Officer Whitfield's composite score was 54.75, eighth out of nine candidates.

As between the plaintiff and Officer Whitfield, a breakdown of their point totals on the promotional process is as follows:

| | Fountain | Whitfield |
|---|---|---|
| Written Examination | 44.00 | 29.00 |
| | (raw score: 88/100) | (raw score: 58/100) |
| Longevity (¼ point per year of unbroken service) | 1.25 | 4.25 |
| Record Evaluation | | |
| 1. Education | 4.00 | 0.00 |
| (two points per year of college) | | |

1. The Background section attempts to recount only undisputed facts. Disputed facts which are included are identified as such.

|  |  | Fountain | Whitfield |
|---|---|---|---|
| 2. | Physical (average last two physical tests) | 3.75 | 3.25 |
| 3. | Firearms (average last four firearms tests) | 3.50 | 3.25 |
| 4. | Chief's Discretion<br>A. Performance<br>B. Conduct<br>C. Awards & Commendations<br>D. Auto Accidents<br>E. Sick Leave<br>F. Miscellaneous | 5.00 | 4.00 |
|  | Oral Interview | 15.00 | 11.00 |
|  | TOTAL SCORE | 76.50 | 54.75 |

The point totals reflect that plaintiff Fountain outscored Whitfield in every category, including both subjective and objective measurements, except for the category of longevity (Whitfield has twelve more years of continuous service than Fountain). Longevity purportedly only counted five (5%) percent in the promotional process. Yet Whitfield was chosen over Fountain. The City does not deny that race was a substantial factor in this decision.

The selection of Officer Whitfield for promotion to the rank of sergeant was made by Chief of Police W. Lynn Taylor. Although Chief Taylor did not have ultimate decision-making authority, his recommendation was approved by the City Director of Human Resources, Bart Thigpen, and the City Manager, C.B. Heys. As a practical matter, the final decision was made by Chief Taylor, because employment decisions in the City of Waycross are normally left to the person in charge of the employing department, and are rarely disturbed by those with ultimate authority.

Chief Taylor, in an affidavit, states that his recommendation of Officer Whitfield "was based on several factors including the Affirmative Action Plan." The "several factors" are not identified anywhere in the record. City Manager C.B. Heys and City Director of Human Resources Bart Thigpen both testified on deposition that they viewed the selection of Whitfield as "consistent with" the City's Affirmative Action Plan. Chief Taylor testified on deposition that, since 1984, when three non-minority officers were promoted to sergeant, he has had several discussions with Heys and Thigpen about the possibility of promoting a black in the Waycross Police Department.

It is undisputed that, at least until the late 1970's, blacks were subject to employment discrimination by the Waycross Police Department. Until the late 1970's, black officers were only permitted to work from ten at night until six in the morning, and only in black sections of Waycross. Black officers were not authorized to arrest white people. When C.B. Heys became City Manager in 1978, there were only two black police officers. Prior to Whitfield's promotion, there has been one black sergeant, Willie Armstrong. Armstrong was promoted to sergeant so that he could receive a pay raise after many years of service; he was not, however, given any commensurate increase in duties or authority. Armstrong, even as a sergeant, was subject to the limitations described above. He could not arrest white people.

W. Lynn Taylor became Chief of Police in the late 1970's. Since that time, discrimination against black officers has gradually been eliminated. The parties appear to agree that there has been no discrimination since 1980. Today, Sergeant Whitfield is one of four blacks out of forty officers on the Waycross police force. Whitfield is the only black out of six sergeants. No blacks hold a position higher than sergeant. Service as a sergeant is a prerequisite to promotion to a higher rank such as lieutenant or captain. The labor pool from which employees of the City of Waycross are drawn is 21.6% black. The City asserts that it has actively recruited blacks to the police department since 1980, but there re-

mains a disparity between the percentage of black police officers and the percentage of blacks in the labor force, and that disparity has existed also, at least until Whitfield's selection, among superior officers on the police force.[2]

The City of Waycross has had an Affirmative Action Plan since 1976 or 1977. According to City Manager C.B. Heys, the Plan was first adopted to meet requirements imposed by federal agencies such as the Department of Housing and Urban Development. The Plan has been amended from time to time, most recently in August of 1986. The stated purposes of the plan are, *inter alia*, to "provide equal employment opportunity and a positive approach to eliminating disparity within the city government," and "to promote or provide equal opportunity for participation in all phases of activities and services provided by the City of Waycross or its instrumentalities." The Plan contains provisions for dissemination of information about employment opportunities to all segments of the community, and generally requires a merit system for making employment decisions. Discrimination on the basis of race, creed, color, sex or national origin is prohibited. The Plan contains a provision on "Promotion Policy," which states that "[i]n all cases of promotion or transfer, the decision will be based solely on the principle of merit."

The City's Affirmative Action Plan as amended in 1986 also contains a provision on "Goals and Timetables," which reads as follows:

> The Waycross City Commission will take affirmative action as necessary in the next three to five years to insure the continued and increased employment of minorities and females as position vacancies in the cited job classes occur. The stated goal is to have City of Waycross employment to be contigious (sic) with the labor force demographics as reflected in Appendix II. The Commission will also continue to evaluate the present staff to attempt to upgrade those minority and female employees with potential for advancement.

The City of Waycross Affirmative Action Plan does not dictate quotas or compel a particular employment decision in a particular situation. Rather, the discretion of those making employment decisions is substantially undisturbed. The Plan merely sets goals for eliminating disparities and attaining greater minority representation within city government. Under the Plan, officials may consider minority status as a favorable factor in making hiring or promotion decisions. Even so, individuals to be hired or promoted must be drawn from a pool of *"qualified"* candidates.[3]

At one time, to be considered, candidates for promotion to the rank of sergeant were required to achieve a score of 70 out of 100 on the written exam portion of the promotional process.[4] Mr. Whitfield scored only 58 out of 100 on the written exam portion of the promotional process. According to Chief Taylor, the 70 point minimum score was abandoned because of concerns that the written exam might work to unlawfully exclude qualified minority can-

**2.** Plaintiff argues that there has been no discrimination in promotions because Willie Armstrong, a black, was a sergeant at a time when there were only two blacks on the force. Inasmuch as Armstrong had no authority over white officers, and could not even arrest white people, the Court cannot believe that the plaintiff would make such an argument.

**3.** This is the City's own interpretation of its Affirmative Action Plan. The Plan is not free of ambiguity. For example, the provision requiring that all promotions be "based solely on merit" is arguably inconsistent with the very concept of affirmative action, which allows consideration of minority status as a favorable factor. Ultimately, the City's interpretation of

*its own plan* is a reasonable one, and this Court is not in any position to reinterpret it.

**4.** Plaintiff asserts that the 70 point raw score requirement for the written exam is shown on Chief Taylor's "General Order 85-1," which was supposed to be attached as Appendix 15 to Plaintiff's Statement of Material Facts as to which there is no issue for trial. Plaintiff's Appendix 15, however, is General Order *81-5* instead of *85-1*, and it does not mention anything about a 70 point raw score requirement for the written exam. Because the City does not deny it, the Court will assume that there was a 70 point requirement at one time, but that it was abandoned prior to Officer Whitfield's promotion.

didates. On deposition Chief Taylor testified that the reason the policy was changed was:

> Because there had been a change in policy a number of years back, really because of you, Mr. Farrington [plaintiff's counsel]. It had to do with a previous case that you and I were involved in, in which the personnel director and I and the city manager conferred, and we found—or we felt like the seventy percent percentile was really just an arbitrary percentile and would tend to exclude ... a lot of people that should be considered.
>
> So, we decided at that point to abandon that particular part of it, and just those that were qualified by virtue of the basic qualifications [would be considered].

Deposition of W. Lynn Taylor at 21–22. Chief Taylor testified that under the revised policy, the only minimum qualifications are two years of continuous satisfactory service as a police officer and successful completion of a physical fitness examination. The test is now merely an aid in the decisional process, one factor to be considered among others.

Chief Taylor's explanation is corroborated by a provision in the City's Affirmative Action Plan as amended in August of 1986. The Plan contains a provision entitled "Remedial Action," which provides:

> The June 21, 1982 decision of the U.S. Supreme Court in *Connecticut v. Winnie Teal* has caused a reexamination of our entry level and promotional examination policies. We have restructured all examinations and test requirements so that they do not constitute an artificial barrier for employment consideration but are only one factor of several in the overall selection process.

This is a reasonable response to the *Teal* decision. In *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Supreme Court held that a discriminatory promotion examination which imposed a minimum score requirement on promotions and had a disparate impact in excluding minority applicants could not be defended in a Title VII action on the ground that the ultimate result of the promotional process was a proportionate racial balance. Justice Powell, in his dissent, noted that a possible response to the *Teal* decision would be to "integrate consideration of test results into one overall hiring decision based on that 'factor' *and* additional factors." 457 U.S. at 463–64, n. 8, 102 S.Ct. at 2539, n. 8 (emphasis in original). Thus, the abandonment of a minimum score can be seen as a reasonable attempt to comply with the law rather than as an arbitrary decision designed to effect the selection of an unqualified black instead of Mr. Fountain, as plaintiff seeks to portray it.

## II. *Analysis*

### A. Summary Judgment

Because summary judgment is a "lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986). All reasonable doubts about the facts are to be resolved in favor of the non-movant, although the non-moving party bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). *See also Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir.1988); *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir.1988). If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 (11th Cir. 1982).

On the other hand, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Moreover, "[s]ummary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and

inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

### B. Municipal Liability

■ The defendant's first argument is that, under 42 U.S.C. § 1983, the City cannot be held liable for any injury suffered by plaintiff because he was not injured by a municipal policy.

It has long been settled that liability under § 1983 cannot be premised on the doctrine of *respondeat superior. See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). When the injury complained of is the result of an unconstitutional municipal policy, however, § 1983 liability against a municipality will be upheld. *See City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Here, plaintiff's complaint is that he was adversely affected by the City's Affirmative Action *policy,* which plaintiff alleges to be unconstitutional. The Court is somewhat incredulous that the City would argue, as it does, that City policy is not implicated in this case. The City asserts, "It cannot be rationally argued that the City has a policy of promoting minorities over white males." Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment at 5. The obvious question posed by this assertion is, "What in the world is the City's Affirmative Action Plan, if not a policy of promoting minorities over white males?" The City's municipal liability argument contradicts facts it has acknowledged elsewhere, and completely misreads the *Praprotnik* decision.

The plaintiff accurately characterizes the City's argument as follows:

(a) Under Georgia law, the policy-makers for the City of Waycross are the City Commission and City Manager;

(b) The City Commission made the policy adopting the affirmative action program;

(c) Sgt. Whitfield was promoted pursuant to that policy by Chief Taylor, who is not a policymaker; and

(d) Therefore the City is not liable.

The absurdity of this syllogism is apparent on its face. Under the City's argument, liability can be avoided in all cases by adopting an unconstitutional policy and appointing non-policymakers to execute it. A *Praprotnik* argument is completely inappropriate in this case, and the issue of the validity of the City's Affirmative Action Plan is squarely presented to the Court.

### C. Affirmative Action

Notwithstanding the Supreme Court's inability to produce a majority opinion on the controversial issue of affirmative action, a consensus has emerged with respect to certain basic principles. First, it is clear that affirmative action plans are legitimate means by which employers can remedy past discrimination in employment. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). In *Wygant,* Justice Powell's plurality opinion imposed a strict standard: affirmative action plans "must be justified by a compelling governmental interest," and the means chosen "must be narrowly tailored to the achievement of that goal." [5] 476 U.S. at 274, 106 S.Ct. at 1846. A different formulation was propounded by Justice Marshall: "remedial use of race is permissible if it serves 'important governmental objectives' and is 'substantially related to achievement of those objectives.' 476 U.S. at 301–02, 106 S.Ct. at 1861, *quoting University of California Regents v. Bakke,* 438 U.S. 265, 359, 98 S.Ct. 2733, 2783, 57 L.Ed.2d 750 (1978) (opinion of Brennan, White, Marshall and Blackmun). Notwithstanding the differing formulations, the Supreme Court "is in agreement that ... remedying past or present racial discrimination is a sufficiently weighty state interest to warrant the use of a carefully constructed affirmative action pro-

---

5. The Eleventh Circuit has applied Justice Powell's standard for reviewing affirmative action plans under the Equal Protection Clause. *See H.K. Porter Co. v. Metropolitan Dade County,* 825 F.2d 324, 330 (11th Cir.1987) (minority preferences in government contracting must be justified by compelling government interest and narrowly tailored to promote that interest).

gram." *Wygant*, 476 U.S. at 286, 106 S.Ct. at 1853 (opinion of O'Connor, J.). The Court has also been in agreement that general societal discrimination is not a sufficient reason for imposing an affirmative action plan; there must have been "prior discrimination by the government unit involved." *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847.[6]

The plaintiff challenges the City's Affirmative Action Plan on three grounds: (1) that that plan is not justified by a compelling governmental interest; (2) that the plan is not narrowly tailored to the achievement of its purpose; and (3) that the plan is applied so arbitrarily as to violate due process. The City on the other hand, asserts that its Plan is justified by a compelling state interest in remedying prior discrimination, and is narrowly tailored to promote that interest.

### 1. *Compelling Governmental Interest*

■ The plaintiff argues that the City of Waycross has not sufficiently demonstrated past discrimination to justify its use of racial preferences in employment decisions. Plaintiff bases this argument primarily on statistics, arguing that the statistical makeup of the City's workforce is not sufficiently disparate from the labor market to support an inference of prior discrimination. It is true that much of the caselaw on affirmative action is concerned with the statistical showing required to support an inference of prior discrimination. However, those cases, and the plaintiff's arguments here, are completely beside the point. Here, the City need not rely on statistics to prove prior discrimination; there is direct and uncontroverted evidence that the Waycross Police Department discriminated against blacks at least until the late 1970's. Until that time, black officers were only allowed to work the night shift, they were only allowed to police black neighborhoods, and they were not authorized to arrest whites.

The discrimination that the City admits is perhaps more repugnant to the Equal Protection Clause than a complete exclusion of blacks from the police force. The hiring of a small number of blacks as second class police officers, with the limited role of helping to keep the black population in line, constitutes a badge of oppression, and a particularly invidious form of discrimination. In the face of such admitted and egregious past discrimination, statistical proof becomes secondary.

■ The plaintiff argues that the City has failed to demonstrate a compelling interest because there has been no proof of discrimination occurring after 1980. Admittedly, discrimination from the remote past will not create a compelling interest *if the discrimination is sufficiently remote. See Hammon v. Barry*, 826 F.2d 73, 77 (D.C.Cir.1987) (a finding that fire department was officially segregated in the early 1950's found insufficient to justify affirmative action; the "substantial temporal gap between the time of the Korean conflict ... and the present ... suggest[ed] that something more recent should serve as a predicate for remedial action right now"). Here, a temporal gap of eight years is not so great as to neutralize the fact of past discrimination. This is especially so here because the Waycross police force remains statistically underrepresented by blacks. At the time of Whitfield's promotion, the patrolman level force was 14.8% black, whereas the relevant workforce was 21.6% black. Further, the City had never promoted a black to be a superior officer, with the exception of the "sham" promotion of Willie Armstrong.

Accordingly, the Court finds that the City of Waycross's Affirmative Action Plan, at least as applied to the Police Department, is justified by a compelling government interest in remedying past discrimination.[7]

---

**6.** Consideration of race in employment decisions or promotions makes me uneasy. It seems inherently unfair to penalize because of race to assist a minority member to receive a promotion. This policy is unlikely to work long. Too much racial tension is created notwithstanding the laudable goal.

**7.** It has been suggested that in the law enforcement context there are additional compelling justifications for racial preferences besides that of remedying prior discrimination. For example, a police chief might reasonably conclude that an integrated police force would lead to better relations with minorities and increased

## 2. *Narrowly Tailored to Achieve its Purpose*

■ The requirement that an affirmative action plan be narrowly tailored to achieve its purpose is designed to minimize the harm suffered by innocent individuals such as Mr. Fountain, who are directly and adversely affected by a plan's racial preference. While some "sharing of the burden by innocent parties" is permissible, the means chosen to remedy prior discrimination must not impose disproportionate harm to, or unnecessarily trammel the rights of, innocent individuals. *See generally Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Britton v. South Bend Community School Corp.*, 819 F.2d 766 (7th Cir.1987).

In this context, a number of possible variations on affirmative action plans have been found to be either more or less objectionable insofar as they burden innocent third parties to varying degrees. For example, "quotas" are more objectionable than "goals," because quotas operate more drastically and inflexibly to exclude innocent individuals from opportunities. *See United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (one for one promotion quota upheld because, although quotas more adversely affect innocent individuals than flexible goals, quota was justified by the Alabama Department of Public Safety's repeated resistance to remedial orders). The more a particular remedy is limited in duration, the less objectionable it will be. *See Howard v. McLucas*, 671 F.Supp. 756, 766–67 (M.D.Ga. 1987) (consent order's reservation of certain promotions for class of black Air Force employees upheld in light of fact that, given the existing rate of promotions, relief would be complete within one year). Preferences in promotion and hiring are less objectionable than preferences in layoffs because layoffs have a far greater detri-

mental impact on adversely affected innocent employees. *See Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851. ("Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment is not as intrusive as loss of an existing job."). Like the denial of future employment, the denial of a promotion is not nearly so disruptive of the life of an affected individual as a layoff would be. *See United States v. Paradise*, 480 U.S. 149, 188, 107 S.Ct. 1053, 1076, 94 L.Ed.2d 203, 234 (1987) (the promotion requirement at issue ... does not disrupt seriously the lives of innocent individuals"). Additionally, the basic limitation that minority individuals receiving a preference must be qualified before they can be hired or promoted has been found to be a feature that makes affirmative action plans less objectionable. *See Paradise*, 480 U.S. at 183, 107 S.Ct. at 1073, 94 L.Ed.2d at 231.

Given the specific features of the Affirmative Action Plan adopted by the City of Waycross, the Court finds that it is narrowly tailored to achieve its purpose of remedying past discrimination, at least as applied to the Police Department. The Waycross Plan contains goals rather than quotas. The goals are inherently flexible; no decision is mandated in a particular situation. Thus, non-minority candidates are not *excluded from competing* for any position. The Waycross Plan, in the section titled "Goals and Timetables", states that affirmative action will be taken "as necessary in the next three to five years [1986 through 1991]." Thus, there is a durational limitation which appears reasonable, given the flexible and gradual progress the Plan calls for. The Goals and Timetables provision refers only to "vacancies" and "advancement"; there is no indication that preferences in layoffs will result. Moreover, the requirement that all employed and promoted individuals be *qualified* remains.[8]

respect for authority in minority neighborhoods, particularly in a city with a history of racial unrest. *See Wygant*, 476 U.S. at 314, 106 S.Ct. at 1868 (opinion of Stevens, J.). Thus, minority hiring and promotional preferences could be justified by a compelling interest in more effectively maintaining law and order. *Id.* The City has not asserted such an interest here.

Therefore, the Court relies only on the asserted interest in remedying prior discrimination in resolving the instant summary judgment motions.

8. Although the parties both assert that their summary judgment motions are based on the same set of undisputed facts, it appears that

The plaintiff has raised one valid objection to the Waycross plan. The plaintiff argues in his response to the City's motion for summary judgment:

> Most troubling about the plan is its goal to increase black City employment far beyond the percentage of blacks in the labor market. Bearing in mind that blacks made up 21.6% of the market, by 1991 it is the City's goal to have 52.1% black employment in the laborer occupations, 50% in the professionals; 36.75% in the operatives; 36.4% in the crafts; 28.6% in the clerical; 27.5% in the service workers; and 26.7% in the officials and managers. In every category of employment, it is the goal of this plan to have blacks substantially over-represented. As the goal of the plan, this cannot be lawful.[9]

The Court agrees. A plan that sets a goal of overrepresentation by minorities is not narrowly tailored to achieve the purpose of remedying prior discrimination. That purpose is satisfied by attainment of minority representation which reflects the relevant labor pool. However, the plaintiff's objection does not affect the present case because there is still an underrepresentation of blacks on the police force; and prior to the promotion of Whitfield there were no black superior officers. Thus, the plaintiff's objection is not yet ripe, or at least does not pertain to the promotion of Whitfield. Accordingly, the Court holds that, except for an objection that is not relevant to this case, the City's Affirmative Action Plan is narrowly tailored to promote a compelling government interest in remedying prior discrimination. Therefore, the City's consideration of race in promoting Whitfield instead of the plaintiff does not offend the Constitution.

### 3. *Arbitrary Application of the Plan*

■ The Waycross Affirmative Action has been in force for twelve years. In that time there have been twelve promotions to the rank of sergeant in the Waycross Police Department; however, before Whitfield, no blacks or females were promoted. Plaintiff argues that the operation of the plan has been so inexplicably unpredictable that it must be deemed arbitrary and a violation of due process. The Court does not find this to be a valid objection.

Employment decisions traditionally and legitimately involve a great deal of employer discretion, and the appearance that such decisions are arbitrary is nothing new. Hiring and promotion decisions are inherently unscientific and unpredictable. While objective criteria can be used to guide the decisionmaker, discretion must remain, so there is an inherent level of what might appear to be arbitrariness. The City's Affirmative Action Plan, because it involves goals instead of quotas, leaves undisturbed much of this inherent discretion.

As to the apparent arbitrary application of the City's plan, that could be ameliorated by the use of quotas instead of goals. Perhaps, given the ineffectiveness in the past of goals, the more stringent remedy of quotas is appropriate for the Waycross Police Department; however, that is a complaint that would appropriately be made only by a black officer, and not the plaintiff.[10] Plaintiff would have standing only to complain that the plan is not narrow enough, *not that it is too narrowly tailored*. The Supreme Court has consistently held that, as far as the rights of innocent individuals such as plaintiff are concerned, the use of goals is preferable to quotas, notwithstanding that goals inherently lead to less predictable decisionmaking. Plaintiff's complaint that the plan is applied

---

there may be some factual dispute as to whether Officer Whitfield was qualified for his promotion. This potential factual dispute is addressed in section II(c)(4) of this Order, *infra*.

9. The City's goals are drawn from certain charts attached as an Appendix to the Affirmative Action Plan. The charts are difficult to make sense out of, but for purposes of this Order the Court accepts the plaintiff's figures.

10. For example, the history of past promotions could support an inference that the police department has not implemented the plan in good faith, but has instead ignored the plan and promoted only white males. Plaintiff has no standing to complain if this is the case.

arbitrarily is simply a function of the use of goals, which is a feature that makes the plan less, not more, offensive to the rights of plaintiff.

### 4. Whether Whitfield is Qualified

One factor that alleviates the burden imposed on innocent individuals by affirmative action plans is the requirement that only "qualified" minority candidates be benefitted by racial preferences. *See United States v. Paradise*, 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203, 231 (1987). This is particularly true in the context of quotas, because the limitation that only qualified candidates be benefitted introduces some flexibility and waivability into what would otherwise be rigid quota requirements. This factor loses some force in the context of goals because, under a "goal" plan, the employer retains discretion to choose nonminority candidates, and it seems highly unlikely that an employer would voluntarily choose an unqualified candidate. Still, an important feature of goal-based plans is the requirement that only qualified individuals benefit from preferential treatment, as illustrated by the following discussion from *Ledoux v. District of Columbia*, 820 F.2d 1293 (D.C.Cir. 1987):

> A related consideration under both *Wygant* and *Johnson* is whether the female or minority applicant who receives preferential treatment under the plan is *qualified* to be hired or promoted. If a nomminority or male employee "loses out" on an available job or promotion in favor of another qualified candidate, he or she has in a very real sense suffered a less severe injury than if passed over in favor of an unqualified candidate. Of course, in both cases the loss of the employment opportunity is the same. However, the *legitimate expectations* of the applicant are necessarily higher in the latter case, since a qualified candidate usually can legitimately expect to be chosen over an unqualified candidate. Where several candidates are qualified,

such expectations are necessarily lower, regardless of the fact that an employer's rating system may somehow deem one candidate "more qualified" than the next.

> Indeed, these points regarding *legitimate expectation* plainly underlie the Court's decision in *Johnson*,[11] where the male employee was "ranked" higher than the competing female job applicant, but the affirmative action taken in favor of the woman was upheld, in part because she was found qualified to perform the job. Another example is seen in *Weber*,[12] where the white male plaintiff was found to have no "entitlement" to participate in the newly-created apprenticeship program—in terms of proven qualifications, lawful seniority, or current occupancy in the job—superior to the entitlement of minority candidates selected pursuant to the affirmative action plan. The obvious point, of course, is that the *expectations* of nonminority candidates do not become *legitimate* merely upon assertion.

> In view of these common-sense distinctions the Court is prepared to sanction—under both Title VII and the Constitution—voluntary plans that authorize employers to treat race or sex as a "plus" factor in choosing among *otherwise qualified* applicants.[13]

*Ledoux v. District of Columbia*, 820 F.2d 1293, 1301–02 (D.C.Cir.1987).

■ Similarly, plaintiff in the present case had no "entitlement" to a promotion as opposed to other qualified candidates. Evidence that in the past the highest ranking candidate has been promoted does not create such an entitlement. However, plaintiff did have a legitimate expectation, acknowledged by the terms of the City's Affirmative Action Plan, in not being passed over for a promotion in favor of an *unqualified* minority candidate.

On the surface, there appears to be a factual dispute as to whether Whitfield was qualified for the promotion at issue here. In response to the City's statement of facts as to which no issue exists to be tried, and

---

**11.** *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).

**12.** *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

**13.** Although *Johnson* and *Weber* are both Title VII cases, they are instructive, as the D.C. Circuit found them to be, in the equal protection context.

in particular in response to the City's assertion that Whitfield "was in the 'pool' of those individuals qualified to be promoted," the plaintiff states: "[D]enied. Mr. Whitfield was not qualified under long standing policies of the Waycross City Police Department." By the reference to "long standing policies," the plaintiff is apparently referring to its assertion, also given in opposition to the plaintiff's statement of facts as to which no issue exists, that "[p]rior to the promotion at issue here, promotions were made from the top of the list, and not from a pool. Prior to the promotion at issue here, a passing score of 70 was required. The promotional process was changed apparently to suit the promotion of Mr. Whitfield."

■ Thus, despite the assertions by both parties that this case is appropriate for summary resolution on an undisputed set of facts, it appears that there is a dispute as to whether Mr. Whitfield was legitimately deemed to be in a pool of qualified applicants. That factual dispute, however, disappears as soon as the actual circumstances of the case are considered, rather than the bare assertions of the parties.

Mr. Whitfield has served as an officer on the Waycross Police force for eighteen years. To inquire factually whether an officer with his level of experience is "qualified" to be promoted to the rank of sergeant is absurd. A different question might be presented if a black person with no law enforcement experience were suddenly installed as sergeant. In the instant case, however, it would be a monumental waste of the Court's time to try the purported factual issue of whether Mr. Whitfield, with his eighteen years of police experience, is "qualified" to be a sergeant.

This does not constitute a *genuine* issue of fact, such as is necessary to defeat a summary judgment motion.

It is understandable that the plaintiff would perceive as unfair the recent abandonment of the 70 point minimum on the written exam portion of the promotional process. However, just as plaintiff is not "entitled" to be chosen for a promotion from a pool of otherwise qualified applicants, plaintiff has no "entitlement" to static promotion criteria. An employer is entitled to reevaluate existing promotion criteria, and modify them if they are determined to be insufficiently related to job performance requirements. Indeed, the examination at issue here could easily have been attacked in a lawsuit as an artificial and discriminatory barrier to promotions for a class of employees. *See Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). That is the very reason asserted by the City for abandonment of the 70 point minimum. The Court cannot accept the plaintiff's position that preexisting promotion criteria were locked in and immutable, especially here, where the abandoned 70 point requirement was arguably unlawful.

### III. *Conclusion*

For the foregoing reasons, the plaintiff's motion for summary judgment is DENIED, and the defendants' motion for summary judgment is GRANTED.

SO ORDERED.