USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________
No. 91-1483 ANNE G. STUART, ET AL., Plaintiffs, Appellants, v. FRANCIS M. ROACHE, AS HE IS POLICE COMMISSIONER OF THE CITY OF BOSTON, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, U.S. District Judge] ____________________ Before Breyer, Chief Judge, Aldrich, Senior Circuit Judge, and Selya, Circuit Judge. ____________________ Barbara A.H. Smith, with whom Regina L. Quinlan and Quinlan & Smith
were on brief for appellants. Jonathan M. Albano with whom Marianne C. Delpo, Bingham, Dana &
Gould, Alan J. Rom, and Lawyers Committee for Civil Rights Under the Law
of the Boston Bar Association were on brief for appellee, Massachusetts
Association of Minority Law Enforcement Officers. William W. Porter, Assistant Attorney General, with whom Scott
Harshbarger, Attorney General, and Eleanor Coe, Assistant Attorney
General, were on brief for appellee, Massachusetts Personnel
Administrator. ____________________ ____________________ BREYER, Chief Judge. For the past eleven years the
Boston Police Department, when promoting officers to the
position of sergeant, has followed terms of a Consent Decree
that require it to favor minority officers solely because of
their race. The basic question on this appeal is whether, in
light of a recent Supreme Court case, City of Richmond v. J.A.
Croson Co., 488 U.S. 469 (1989), those Consent Decree terms
remain legally binding. We conclude that Croson has not
radically changed applicable preexisting law and that the
Consent Decree remains legally valid. I Background State law has long required the Boston Police
Department (Department) to follow a two-step process in
promoting officers to the position of sergeant. First,
officers who have served for three years may take a
promotional examination. Those who pass the exam are placed
on a promotion list, where they are ranked according to score. Mass. Gen. L. ch. 31, 25. Second, the promoting official,
the Police Commissioner, fills sergeant vacancies from this
list of eligible officers, roughly according to rank order. To be more specific, the Commissioner follows a rule of "2n +
l," a rule that means that, if there are five sergeant
vacancies (n = 5), the Commissioner fills them from the top 11
persons on the list ((2 x 5) + l); if there are 15 vacancies,
the Commissioner fills them from the top 31 persons on the
list, and so forth. Mass. Gen. L. ch. 31, 27; Personnel
Administration Rule 9 (1988); Haley Aff. at 3. In 1978 the Massachusetts Association of Afro-
American Police, Inc. (MAAAP) sued the Boston Police
Department claiming that Step One of its promotion system --
the testing procedure -- was biased against black officers. It argued that the tests, along with previous discrimination
at the entry level, had created a virtually all-white cadre of
sergeants. Cf. Castro v. Beecher, 334 F. Supp. 930 (D. Mass.
1971), aff'd in part and rev'd in part, 459 F.2d 725 (1st Cir.
1972) (finding that entry-level Police Department testing
unlawfully discriminated against black applicants). The
result of this discrimination, MAAAP said, was a Department
where, in 1978, only one (or .45 percent) of 222 sergeants was
black, although blacks comprised 5.5 percent of the roughly
2200 police officers in the force and 20 percent of the
population of Boston as a whole. In 1980, MAAAP and the Department settled their
lawsuit. They entered into a Consent Decree in which (among
other things) the Department promised to use only promotional
tests specially validated as anti-discriminatory and fair. The Decree also says that the police "Commissioner shall make
appointments to overcome any underutilization [of minorities]
that may exist among sergeants in accordance with the goals
set forth in Appendix B." Appendix B contains a Table
entitled "Goals and Timetables." The Table sets forth a list
(year by year) of the "projected number of sergeants," the
"projected number of positions to be filled," and a set of
related "goals" for the number of black sergeants in the
Department. These goals, if achieved, would have meant 25
black sergeants by the year 1985, creating a Department with
about 9 percent black sergeants. See Consent Decree, Appendix
B. The Appendix also states that "the Department is to make
a good faith effort to reach these goals." The Decree, by its
terms, was to expire in 1985. During the Decree's initial life -- between 1980 and
1985 -- the Department failed to give any "validated-fair"
examinations, and it failed to meet the Consent Decree's
numerical goals. As a result, MAAAP successfully petitioned
the court to extend the Decree's life until 1990 and to modify
its "Goals and Timetables" to reflect the increasing number of
qualified blacks in the Department. Between 1985 and 1990,
the Department successfully administered one "validated-fair"
examination. The number of blacks promoted during this time,
however, still fell short of the Decree's numerical goals. Thus, in 1990, at MAAAP's and the Department's joint request,
the court extended the Decree once more, until the Department
gave one additional "validated-fair" examination -- an
examination that the Department had scheduled for later this
year. Since the parties expected that, by December 1991,
nearly 20 percent of promotion-eligible officers would be
black, the court revised the Decree's numerical goal to 40, or
15.5 percent, of the Department's sergeants. In October 1990, thirty-four white police officer
plaintiffs filed this action against the Boston Police
Department. The white plaintiffs complain, and the Department
concedes, that the Commissioner did not appoint them to the
rank of sergeant, that they had higher test scores than a
number of black officers whom the Commissioner did appoint to
the rank of sergeant, that the scores of at least some of the
promoted black officers placed those black officers below the
("2n + l") civil service rule cut-off point that would have
prevented their appointment in the absence of the Consent
Decree, and that (in the Commissioner's words) the white
plaintiffs "were all passed over because of . . . compliance
with the consent decree." Roache Dep. at 25. The plaintiffs
argue that the law clearly would prohibit this type of "race-
conscious" promotion in the absence of the Consent Decree. And, they add that, in light of Croson, the Decree is
powerless to authorize or to require such discrimination. The district court, after reviewing past and present
Supreme Court opinions in this area, concluded that the Decree
is lawful and may compel this kind of race-conscious activity
as a remedial measure, correcting prior anti-black
discrimination. The plaintiffs have appealed, asking us to
re-examine the legality of the Decree in light of the Croson
decision. II The Legality of the Decree The Consent Decree at issue classifies police
officers according to race. It provides benefits based upon
race. The Supreme Court has made clear that any court, in
deciding whether such a classification is lawful, must subject
it to "strict scrutiny." See Croson, 488 U.S. at 494
(plurality of four Justices) ("reaffirm[ing] the view
expressed by the plurality in Wygant that the standard of
review under the Equal Protection Clause is not dependent on
the race of those burdened or benefited by a particular
classification"); id. at 519 (Kennedy, J., concurring in part
and concurring in the judgment) ("accept[ing] . . . rule
contained in Justice O'Connor's opinion"); id. at 520 (Scalia,
J., concurring in the judgment) ("agree[ing] . . . that strict
scrutiny must be applied to all governmental classification by
race, whether or not its asserted purpose is 'remedial' or
'benign.'"); Wygant v. Jackson Bd. of Educ., 476 U.S. 267,
279-80 (1986) (plurality); id. at 285-86 (O'Connor, J.,
concurring in part and concurring in the judgment). Although different members of the Court have
described differently what they believe "strict scrutiny"
means, see Croson, 488 U.S. at 518-19 (Kennedy, J., concurring
in part and concurring in the judgment) (contrasting strict
scrutiny standard of plurality with that of Justice Scalia),
we believe a majority of the Court has concluded that the
standard requires us to make certain that any race-conscious
relief is justified by a "compelling state interest," see,
e.g., id. at 505, and that any such relief is "narrowly
tailored" to further that interest. Id. at 507-08. See also
United States v. Paradise, 480 U.S. 149, 167 (1987)
(plurality) (setting out both parts of strict scrutiny test);
Wygant, 476 U.S. at 274 (plurality) (same); id. at 285
(O'Connor, J., concurring in part and concurring in the
judgment) (same). The Court has also accepted an equally
important proposition, namely that a compelling state interest
"unquestionably" exists where a race-conscious employment
program "remed[ies] past and present discrimination by a state
actor." Paradise, 480 U.S. at 167 (plurality). See also
Wygant, 476 U.S. at 274 (plurality) (to justify racial
classification, need "showing of prior discrimination by the
government unit involved"). In light of these propositions,
the race-conscious relief before us is lawful if it represents
a "narrowly tailored" effort to remedy past Police Department
discrimination against minority groups. A Compelling Interest As we read the relevant Supreme Court opinions, the
basic question before us is an evidentiary issue: Is there a
"strong basis in evidence" for the conclusion that the Consent
Decree here at issue serves a remedial purpose with respect to
past discrimination? Croson, 488 U.S. at 500, quoting Wygant,
476 U.S. at 277 (emphasis added). We recognize that, at one
point, Justice Powell may have suggested a stronger
evidentiary standard. In a well-known plurality opinion, he
wrote that "judicial, legislative, or administrative findings
of constitutional or statutory violations" may be necessary to
trigger a governmental interest in remedying past
discrimination. Regents of Univ. of Cal. v. Bakke, 438 U.S.
265, 307 (1978) (emphasis added). Justice Powell, however,
later wrote in support of a less strict standard, authorizing
race-conscious relief where the public entity had a "strong
basis in evidence for [the] conclusion that remedial action
was necessary." Wygant, 476 U.S. at 277 (plurality) (emphasis
added). See also id. at 289 (O'Connnor, J., concurring in part
and concurring in the judgment) ("agree[ing] with the
plurality that a contemporaneous or antecedent finding of past
discrimination by a court or other competent body is not a
constitutional prerequisite"). A majority of the Supreme
Court in Croson used the words "strong basis" and "prima facie
case" in this context. Croson, 488 U.S. at 500, quoting
Wygant, 476 U.S. at 277 (plurality). See also Wygant, 476
U.S. at 292 (O'Connor, J., concurring in part and concurring
in the judgment). Hence, that is the evidentiary standard
that we use. In this case, the record provides "strong evidence"
that the race-conscious relief in the Consent Decree serves a
proper remedial purpose. For one thing, the Consent Decree
itself recites figures that would appear to make out a "prima
facie" case of unlawful discrimination in the promotion of
black officers. For example, the Decree points out that, at
the time MAAAP filed its complaint (March 2, 1978), only one
of 222 sergeants in the Boston Police Department was black,
yet approximately 72 black officers were eligible for
promotion. The relevant percentages -- 0.45 percent black
sergeants in a Department with 4.5 percent eligible black
police officers -- would seem to make out a prima facie case
of discrimination under "disparate impact" analysis as applied
by many courts. Cf. Hazelwood School Dist. v. United States,
433 U.S. 299, 308 n.14, 311 n.17 (1977); Castaneda v. Partida,
430 U.S. 482, 497 n.17 (1977); Peightal v. Metropolitan Dade
County, 940 F.2d 1394, 1406 (11th Cir. 1991). Undisputed
figures in the complaint, describing 1970s tests and their
results, would strengthen the case. Plaintiffs contend that the statistical disparities
in the Department cannot be sufficient to justify an
affirmative action plan because the Supreme Court in Croson
found that even greater disparities did not constitute
"strong" or "firm" evidence of prior discrimination. Plaintiffs, however, misinterpret the Croson Court's rationale
for dismissing the significance of the statistical evidence in
that case. In Croson, the Richmond City Council adopted a set-
aside program that "required prime contractors to whom the
city awarded construction contracts to subcontract at least 30
percent of the dollar amount of the contract" to minority
businesses. Croson, 488 U.S. at 477. The trial court found
that the set-aside program was appropriate because, among
other things, "minority businesses received .67 percent of
their prime contracts from the city while minorities
constituted 50 percent of the city's population." Id. at 499. The Supreme Court rejected this rationale. It did not do so,
however, because the gross disparity suggested by the
statistics was insufficiently large. Rather, the Court did so
because of the way in which the Council had compared minority
participation in the construction industry with general
population figures. While acknowledging that "gross
statistical disparities" may alone constitute prima facie
proof of prior discrimination, id. at 501, the Court declared
that "where special qualifications are necessary, the relevant
statistical pool for purposes of demonstrating discriminatory
exclusion must be the number of minorities qualified to
undertake the particular task." Id. at 501-02 (emphasis
added). The Court noted that, "[i]n this case, the city does
not even know how many [minority enterprises] in the relevant
market are qualified to undertake prime or subcontracting work
in public construction projects." Id. at 502. More
generally, where special qualifications are relevant, a
comparison to general population figures will not tend to show
past discrimination by the specific governmental unit
involved, for it may just as well reflect "past societal
discrimination in education and economic opportunities . . .
." Id. at 503. And, as the Court has repeatedly warned,
societal discrimination alone is too amorphous a basis upon
which to justify a racially classified remedy. Id.; Wygant,
476 U.S. at 276 (plurality); Bakke, 438 U.S. at 307
(plurality). In the present case, however, the "comparison"
figures do not appear to reflect simply general "societal"
discrimination. The Decree compares the number of black
sergeants, not with the Boston population in general, but with
those police officers with the minimal qualifications needed
to become sergeants. The fact that, of the latter pool, 4.5
percent of the officers are black, as opposed to .45 percent
who become sergeant, at least casts doubt on the fairness of
the promotion process and requires further explanation. Wygant, 476 U.S. at 293 (O'Connor, J., concurring in part and
concurring in the judgment) (when the public employer
"introduces its statistical proof as evidence of its remedial
purpose, thereby supplying the court with the means for
determining that [the employer] had a firm basis for
concluding that remedial action was appropriate, it is
incumbent upon the nonminority [employees] to prove their
case; they continue to bear the ultimate burden of persuading
the court that the . . . evidence did not support an inference
of prior discrimination . . . ."). Plaintiffs, in an effort to discredit these numbers,
point out that the Department selects its police sergeants
from among those officers who pass the sergeants' examination. They suggest that the pool of qualified applicants (against
which the small number of black sergeants are measured)
consequently should have been those who passed the
examination, not those who took it. However, to treat the
former group as the "pool of eligibles," would assume that the
examination was a fair non-discriminatory device for screening
applicants. And, it is just this assumption that the tiny
percentage of black sergeants (measured against the larger
percentage of eligible black examination-takers) calls into
question. MAAAP, in its original complaint, charged that the
examination itself discriminated unfairly, pointing out, for
example, that pass rates for blacks who took the examination
were, in 1974 and in 1977, 62 percent and 28 percent of pass
rates for whites who took the examination. The very purpose of "disparate impact" analysis is
to use a numerical comparison that will help identify a
possibly unfair, discriminatory hurdle interposed between the
eligible minority applicant and success. Watson v. Fort
Worth Bank & Trust, 487 U.S. 977, 987 (1988). To choose both
"pool of eligibles" and "successful applicants" from the far
side of the hurdle would destroy the point of the analysis;
and the law does not require courts to do so. See, e.g.,
Powers v. Alabama Dept. of Educ., 854 F.2d 1285, 1297 (11th
Cir. 1988) ("By requiring that the plaintiffs [in disparate
impact suit] limit their comparison pool to only those blacks
who had been certified [for advancement], the district court
simply begged the question."), cert. denied, 490 U.S. 1107
(1989). Plaintiffs also argue that the pool of eligible
officers should be made up of those who actually applied for
promotion, not just those who were eligible on paper. They
have presented no evidence, however, either here or in the
district court, that doing so would make any significant
difference. We have no reason to believe that the percentage
of eligible officers who would ask for promotion would differ
by race. Thus, unlike Croson, the numbers mentioned in the
Decree make out a plausible prima facie case of unlawful
discrimination. For another thing, the Decree refers to Castro v.
Beecher, 459 F.2d 725 (1st Cir. 1972), a litigated case that
suggests a different, obvious, and perhaps more important
reason why the Boston Police Department had only one black
sergeant in 1978. In Castro, this court affirmed a lower
court finding that the Department discriminated against black
applicants in its hiring practices, through the use of entry-
level testing procedures that improperly favored white
applicants. The result, as of 1970, was a Police Department
with just over 2 percent of its officers black or hispanic, in
a city where these minority groups comprised 16 percent of the
total population. Obviously, if few blacks become police
officers, few blacks will become sergeants. Castro required the Department to begin, in the
early 1970s, to remedy this situation by instituting efforts
to hire a greater number of black officers. Yet remedial
action takes time, and discrimination may linger for many
years in an organization that had excluded blacks from its
ranks. As we have said, by the end of the 1970s,
approximately 5.5 percent of the police force was black, but
only 4.5 percent of those officers with three years of
experience and 2.6 percent of those with seven years of
service were black. The Consent Decree itself indicates that
experience matters. While an officer must have served three
years in order to apply to become a sergeant, successful
applicants had served an average of seven or more years in the
police force. One obvious reason, then, why there may have been
few black sergeants in the Boston Police Force in 1978 is that
the Department had not hired many black police officers before
1970. Since unjustified discrimination accounted for the
latter fact, the latter fact cannot excuse the former. See
Paradise, 480 U.S. at 168 (plurality) (where "[d]iscrimination
at the entry level necessarily precluded blacks from competing
for promotions, and resulted in a departmental hierarchy
dominated exclusively by non-minorities. . . . [the Department
cannot] segregate the results achieved by its hiring practices
and those achieved by its promotional practices."). See also
Powers, 854 F.2d at 1299 (relative inexperience of black
employees will not rebut showing of disparate impact where it
is "likely that racial discrimination was responsible for the
difference in blacks' and whites' length of service"); Watkins
v. Scott Paper Co., 530 F.2d 1159, 1168 (5th Cir.) (same),
cert. denied, 429 U.S. 861 (1976); cf. Griggs v. Duke Power
Co., 401 U.S. 424, 430 (1971); Oliver v. Digital Equip. Corp.,
846 F.2d 103, 110 (1st. Cir. 1988)("employer can be placed
under a higher burden . . . upon a showing of past
discrimination . . . ."). Indeed, litigated court findings of
recent entry-level discrimination would seem sufficient to
justify race-conscious remedies at both entry and promotional
levels. See, e.g., Higgins v. City of Vallejo, 823 F.2d 351
(9th Cir. 1987) (1982 affirmative action program supported by
1973 state agency finding of discrimination and racial
imbalance in municipal workforce), cert. denied, 489 U.S. 1051
(1989); Fountain v. City of Waycross, 701 F. Supp. 1570, 1577
(S.D. Ga. 1988) (statistical evidence unnecessary where direct
and uncontroverted evidence that Department engaged in a
pattern of discrimination against blacks 8 years ago). In sum, if we look only to the Decree itself and an
earlier litigated case, we find (1) numbers that make out a
"disparate impact;" (2) a past history of entry-level
discrimination; (3) allegations of unfair, discriminatory
promotional examinations; and (4) no significant effort by the
Department or the plaintiffs, here or earlier, to rebut the
natural inference of discrimination arising from the first
three of these circumstances. These four factors provide a "strong" or "firm" basis in evidence of prior discrimination. And, that discrimination, in turn, demonstrates a "compelling
purpose" for race-based relief. Wygant, 476 U.S. at 277-
78 (plurality); id. at 292-93 (O'Connor, J., concurring); Croson, 488 U.S. at 500 (quoting Wygant, 476 U.S. at 277). Plaintiffs, in a heroic effort to overcome the force
of these considerations, argue that the Consent Decree itself
forbids us to take account of some, or all, of them. The
Decree contains a disclaimer of liability, which states: The consent of the parties shall in no manner constitute findings on the merits in this action, nor shall it be construed as an admission by the defendants of any violation . . . nor shall it be construed as an admission by the defendants to any of the matters in the complaint filed in this action.
Plaintiffs argue that this disclaimer precludes defendants
from introducing, and the court from considering, at least
statistical evidence of disparities found in the Decree. However, that is not what the disclaimer says. The
disclaimer simply precludes the Decree's use as an "admission"
of liability, or as an "admission" of the facts and violations
mentioned in the complaint. It does not say that it precludes
litigation by others. It does not say that it applies to
facts agreed to in the Decree itself. Nor does it say that
the Department may not subsequently admit to the same facts
for other purposes (which they have done in the case before
us). Indeed, to read the disclaimer more broadly, as
permanently barring the parties from relying on the facts
cited in the Decree, would effectively prevent the signatories
from defending the Decree against third party challenges. Such an interpretation would conflict with the express wording
of the Decree (requiring the parties to repel such challenges)
and with the intent of the parties in adopting the remedial
plan. It is not surprising that courts, in roughly comparable
cases, have uniformly stated that a disclaimer will not bar
the consideration of evidence of past discrimination
introduced in the action. See generally, Donaghy v. City of
Omaha, 933 F.2d 1448, 1460 (8th Cir. 1991); Howard v. McLucas,
871 F.2d 1000, 1008 (11th Cir.), cert. denied, 493 U.S. 1002
(1989); Kirkland v. New York State Dept. of Correctional
Servs., 711 F.2d 1117, 1131 n.16 (2d Cir. 1983), cert. denied,
465 U.S. 1005 (1984); Stotts v. Memphis Fire Dept., 679 F.2d
541, 553 n.10 (6th Cir. 1982), rev'd on other grounds sub nom.
Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561
(1984); United States v. City of Alexandria, 614 F.2d 1358,
1364-65, 1365 n.15 (5th Cir. 1980); United States v. City of
San Francisco, 656 F. Supp. 276, 285 n.9 (N.D. Cal. 1987);
EEOC v. American Tel. & Tel. Co., 419 F. Supp. 1022, 1038 n.16
(E.D. Pa. 1976), aff'd, 556 F.2d 167 (3d Cir. 1977), cert.
denied, 438 U.S. 915 (1978). We can find no reason to depart
from this authority. Our reading of the disclaimer's effect, of course,
does not prevent the parties in a reverse discrimination suit
such as this one from offering additional evidence in support
of, or in opposition to, the specific facts mentioned in the
Decree. But, the plaintiffs, when opposing the defendant's
summary judgment motion did not point to any such evidence. Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 256 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,
327 (1986). To the contrary, in their own motion for summary
judgment, plaintiffs said "there is no genuine issue as to any
material fact," and "rely," among other things, on the
Consent Decree for support. B Narrow Tailoring Any race-based remedy for prior discrimination must
also be "narrowly tailored to the achievement of that goal." Wygant, 476 U.S. at 273-74 (quoting Fullilove v. Klutznick,
448 U.S. 448, 480 (1980) (opinion of Burger, C.J.)). The
following features of the relief at issue convince us that the
relief ordered here meets this requirement. First, the pool of minority officers benefitting
from the relief is the qualified pool of those who have passed
civil service examinations validated as fair and non-
discriminatory. See Paradise, 480 U.S. at 177-78 (plurality)
(appropriate relief where qualified applicants promoted and
where Department not obligated to make unnecessary or
gratuitous promotions). Second, the promotional goals contained in the
Decree are linked to the size of the relevant qualified labor
pool. See Paradise, 480 U.S. at 187 (Powell, J., concurring)
(in determining whether remedy is narrowly tailored, a court
may examine "the relationship between the percentage of
minority workers to be employed and the percentage of minority
group members in the relevant population or workforce"); id.
at 199 (O'Connor, J., dissenting). See also Croson, 488 U.S.
at 507 (criticizing plans based on general population figures
under second prong of strict scrutiny). Indeed, the goals
fall short of the projected number of black officers eligible
for promotion. For example, as projected, the 1991 goal for
black sergeants amounts to 15.5 percent of all sergeants,
while the eligible pool contains about 20 percent black
officers. Third, the Commissioner, in promoting from the list
of those who have passed the examination, gives only limited
advantage to minority officers, increasing the number of black
sergeants gradually over time. The Decree sets as its
original "goal" the promotion of 5 blacks to sergeant out of
a projected 24 promotions available in 1981; the promotion of
7 blacks to sergeant out of a projected 35 promotions
available in 1985; and so forth. The revised "Timetables and
Goals," as entered by the district court in 1990, sets as a
"goal" the promotion of 13 blacks to sergeant out of a
projected 58 promotions available in 1991. Thus, the Decree
limits only to a rather small extent the ability of white
police officers to become sergeants. Indeed, white officers
passed over on one test may be considered for future
appointments. Compare Wygant, 476 U.S. at 283, with Johnson
v. Transportation Agency, Santa Clara County, Cal., 480 U.S.
616, 638 (1987) ("[D]enial of the promotion unsettled no
legitimate, firmly rooted expectation on the part of the
petitioner. Furthermore, while the petitioner in this case
was denied a promotion, he retained his employment with the
Agency, at the same salary and with the same seniority, and
remained eligible for other promotions."); Higgins, 823 F.2d
at 360 ("Like hiring goals, promotion guidelines visit a minor
burden on nonminority employees. But unlike hiring goals,
promotion guidelines do not require that an individual bear
the burden of past discrimination to the extent that he or she
is denied a livelihood."). Fourth, the Decree is limited in time and will
likely terminate sometime next year. Local 28, Sheet Metal
Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 479 (1986)
(plurality) (remedial goals should be temporary); Paradise,
480 U.S. at 178 (goals are ephemeral, contingent on
Department's conduct); Fullilove v. Klutznick, 448 U.S. 448,
513 (1980) (Powell, J., concurring) (temporary nature ensures
"that a race-conscious program will not last longer than the
discriminatory effects it is designed to eliminate"). Plaintiffs point out that the Decree has been extended twice
since its original expiration date in 1985, and it could be
extended further. But strong reasons supported the
extensions. As of 1985, the Department had failed to give the
"validated-fair" examinations called for by the Decree. By
1990, the Department had given only one such examination and
had failed to meet the Decree's goals. In 1990, the
Department was planning for its second "validated-fair"
examination in ten years, an examination that was to take
place in 1991. That fact, along with the changing racial
composition of the police force, made a brief extension and
somewhat revised goals appropriate. Cf. Sheet Metal Workers,
478 U.S. at 478 (plurality); id. at 487-8 (Powell, J.,
concurring in part and concurring in the judgment); Paradise,
480 U.S. at 178 & n.29 (plurality). The Decree "is not being
used to achieve and maintain racial balance, but rather as a
benchmark against which the court could gauge . . . efforts to
remedy past discrimination." Sheet Metal Workers, 478 U.S. at
477-78; Johnson, 480 U.S. at 639 (decree intended only to
"attain a balanced workforce, not to maintain one"); United
Steelworkers v. Weber, 443 U.S. 193, 216 (1979) (Blackmun, J.,
concurring). Fifth, the Decree explains why alternative,
racially-neutral relief alone would likely prove inadequate by
describing how the Department's efforts in the 1970s failed to
produce fair testing procedures or reduce the impact of
seniority on promotion. See Paradise, 480 U.S. at 171
(plurality) ("In determining whether race-conscious remedies
are appropriate, we look to several factors, including
the . . . efficacy of alternative remedies."); Croson, 488
U.S. at 507; Wygant, 476 U.S. at 280 n.6 (plurality). The
Consent Decree, as a result, included the minority training
and education programs that the plaintiffs advocate, as well
as the relief here now before us. In sum, the race-conscious relief here at issue
represents a narrowly tailored effort, limited in time, to
overcome the effects of past discrimination. As such, it is
lawful. Paradise, 480 U.S. at 185-86 (plurality); Wygant, 476
U.S. at 274 (plurality). And, the efforts in favor of
eligible black police officers that it mandates therefore do
not violate any statute or the Constitution of the United
States. III Other Arguments The plaintiffs make two additional legal claims. First, they argue that state law granted them a "property
right" to a promotion; and that to deny them a promotion
without a hearing deprives them of their "property, without
due process of law." U.S. Const. amend. XIV, 1. Board of
Regents v. Roth, 408 U.S. 564, 569-70 (1972); Perry v.
Sindermann, 408 U.S. 593, 601 (1972). We have previously
held, however, that, where an appointing authority may
consider factors in addition to the applicants' ranking on an
eligibility list, a police officer's expectation of promotion
based on that list will not rise to the level of a "property
interest" entitled to constitutional protection. Burns v.
Sullivan, 619 F.2d 99, 104 (1st Cir.) (police officer does not
possess property right in promotion based on written
examination scores), cert. denied, 449 U.S. 893 (1980). Cf.
Callanan v. Personnel Adm'r for the Commonwealth, 400 Mass.
597, 601 (1987); McCue v. Director of Civil Service, 325 Mass.
605, 608 (1950). Since the eligible officers do not have a
"property right" in promotions, the Fourteenth Amendment
consequently does not offer them procedural protections. Roth, 408 U.S. at 578; Cleveland Bd. of Educ. v. Loudermill,
470 U.S. 532, 538 (1985), Bishop v. Wood, 426 U.S. 341, 347
(1976). Second, plaintiffs argue that the Commissioner's
race-conscious promotion policy amounts to intentional racial
discrimination and thereby violates 42 U.S.C. 1981
(providing "equal rights under the law" for all persons within
United States). For the reasons set forth in Section II of
this opinion, however, we find that the race-based relief was
justified by a compelling state interest and narrowly tailored
to serve that interest. Since a valid remedial plan provides
a legitimate nondiscriminatory basis for race-based employment
decisions, plaintiffs' 1981 claim must also fail. Boston
Chapter, NAACP v. Beecher, 679 F.2d 965, 976 (1st Cir. 1982)
(race-conscious relief permissible under 1981 and 1983, as
well as Title VII), vacated on other grounds sub nom. Boston
Firefighters Union, Local 718 v. Boston Chapter, NAACP, 461
U.S. 477 (1983) (per curiam). See also Setser v. Novack Inv.
Co., 657 F.2d 962, 966-67 (8th Cir. 1981) (en banc) (race-
conscious plans to remedy past discrimination not barred by 1981) (citing cases); Edmonson v. United States Steel Corp.,
659 F.2d 582, 584 (5th Cir. 1981). Cf. Johnson, 480 U.S. at
626-27 ("existence of an affirmative action plan provides [a
nondiscriminatory] rationale" for race-conscious promotions
and a valid defense to Title VII reverse discrimination
claim); Paradise, 480 U.S. at 167 (plurality) (upholding race-
conscious relief against Equal Protection challenge); Sheet
Metal, 478 U.S. at 479-80 (plurality) (same). For these reasons, the judgment of the district
court is Affirmed. Appendix BOSTON POLICE DEPARTMENT GOALS AND TIMETABLES: BOSTON POLICE SERGEANT Date July 1980
Dec. 1981
Dec. 1982
Dec. 1983
Feb. 1985
Projected
No. Of
Sergeants 228 242 270 270 270
Projected
No. Of
Positions
To Be
Filled 25 24 35 30 35
Projection
of Blacks
As A
Percentage
Of Patrol
Officers
With 3
Years In Grade* 4.4 7.1 7.0 12.6 14.6
Projection
of Blacks
As A
Percentage
Of Patrol
Officers
With 7
Years In Grade** 2.6 3.4 4.6 4.4 6.9 GOALS Blacks As A
No. of Black Percentage
Sergeants*** Of Sergeants 3 1.3 8 3.2 13 4.8 18 6.7 25 9.2
* Three years in grade as a patrol officer is a requirement for promotion to sergeant.
** It has been the experience of the Department that those officers actually promoted to sergeant have had 7 years in grade as patrol officers.
*** Includes sergeants who serve in higher, non-Civil Service positions. The figures in these Goals and Timetables do not reflect unanticipated attrition. BOSTON POLICE DEPARTMENT GOALS AND TIMETABLES: BOSTON POLICE SERGEANT BLACKS AS A PERCENTAGE OF PATROL NO. OF OFFICERS WITH NO. OF BLACKS AS A NO. OF POSITIONS TO THREE YEARS BLACK PERCENTAGE OF
DATE SERGEANTS BE FILLED EXPERIENCE SERGEANTS SERGEANTS
September 213 permanent 0 17.31 27 permanent 12.68
1990 plus 45 acting (or 210 black plus 8 acting or provisional officers of a or provisional appointments total of 1213) appointments GOALS December 200 58 19.56 40 15.50
1991 (replace 45 (or 284 black provisional officers of a appointments total of 1452) and fill 13 retirement positions)