**PATROLMEN'S BENEVOLENT ASSO-CIATION OF THE CITY OF NEW YORK, INCORPORATED, for itself and on behalf of its members, Police Officers Gary Johnson, Missie Lewis–Manning, Robert Drayton, Marva Gardner, Demetria Singleton, Margo McKenzie, Robert Winslow, Kenneth Zephrin, Oscar Espinal, Dave Guevara, Peggy Alves, Robin Irvin, Silas Plunkett, Ronny Forbes, Alton Walker, Barry Hinds, Tselanee Kitching, Laverne Stuger, Michael Butler, Carole P. Sievwright, Inger Barron, and Ronald S. Archer, Plaintiffs,**

v.

**The CITY OF NEW YORK, Rudolph Giuliani, as Mayor of the City of New York and individually, Howard Safir as Police Commissioner of the City of New York and individually, New York City Deputy Police Chief Patrick Brennan, officially and individually, Deputy Police Chief Corneilius J. Dever, officially and individually, Chief Michael A. Markman, officially and Individually, Patrick J. Kelleher, First**

Deputy Commissioner, officially and individually, Sgt. Deborah Peters, of the Patrol Borough Chief's Office, individually and in her official capacity, Patrol Chief Wilbur Chapman, individually and in his official capacity, Defendants.

No. 97 Civ. 7895(SAS).

United States District Court, S.D. New York.

Sept. 17, 1999.

Joan M. Cresap, Trager, Cronin & Byczek, L.L.P., Lake Success, NY, for Plaintiffs.

Donald Sullivan, Assistant Corporation Counsel, New York City, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

TABLE OF CONTENTS

I. Introduction ......................................................................324
II. Background .......................................................................325
III. Legal Standard for Summary Judgment ..............................................326
IV. Discussion .......................................................................326
 A. Plaintiffs' Equal Protection Claim ...........................................326
 1. "Operational Needs" May Constitute a Compelling State Interest ...................327

**324**

2. Whether Action Was "Narrowly Tailored" Remains Disputed Question of Fact Precluding Summary Judgment ............................................... 330
 a. Flexibility and Duration ...................................................... 330
 b. Efficacy of Alternative Remedies ........................................... 331
 B. Plaintiffs' Title VII Claim ........................................................ 332
 1. Legal Analysis Applicable to Cases Involving Direct Evidence of Discrimination ....... 332
 2. Issue of Whether Transfer Was An Adverse Employment Action Precludes Summary Judgment ......................................................................... 333
 a. What Constitutes an "Adverse Employment Action" ....................... 333
 b. Facts at Issue ............................................................ 335
 3. Defenses Available Under Title VII ........................................... 337
 a. Bona Fide Occupational Qualification Exception .......................... 337
 b. Valid Affirmative Action Plan ........................................... 338
V. Conclusion ........................................................................ 339

## I. Introduction

The Patrolmen's Benevolent Association of the City of New York ("PBA"), brings this employment discrimination action against defendants, the City of New York and the New York City Police Department ("NYPD"), on behalf of itself and twenty-two black and black-Hispanic police officers who were involuntarily transferred to the 70th Police Precinct in August 1997, following the torture and beating of Abner Louima.[1] Plaintiffs allege that defendants' consideration of their race, color and national origin in deciding to transfer them from one precinct to another violated the equal protection clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq., as amended, 42 U.S.C. §§ 1981, 1983 and 1985 and the New York State Human Rights Law. Plaintiffs seek monetary damages and injunctive relief. Defendants do not dispute that race was the basis for the transfer decision. Rather, defendants argue that their actions were justified by exigent circumstances in the community patrolled by the 70th Precinct.[2]

Defendants now move for partial summary judgment on plaintiffs' equal protection claim, asserting that "operational needs" is a legally cognizable defense to claims of improper race-based transfers of police officers. Defendants also move to dismiss plaintiffs' Title VII claim, alleging that plaintiffs have failed to allege an adverse employment action. Plaintiffs have cross-moved for summary judgment on their equal protection claim, contending that defendants' transfer decision was not narrowly tailored to meet a compelling state interest. In addition, plaintiffs have moved for partial summary judgment on their Title VII claim to exclude certain defenses to that claim.

The facts of this case are unique. Never before has the New York City Police Department resorted to race-based transfers of police officers in response to a crisis. At the outset, it is also important to note that:

> [a] discussion of the police function is essentially a description of one of the basic functions of government, especially in a complex modern society where police presence is pervasive. The police

1. Plaintiffs are employed by the New York City Police Department and are members of the PBA, the union which is the official bargaining unit for New York City police officers. Defendants are high-level employees of the New York City Police Department. The parties have stipulated to the dismissal of all claims against Mayor Giuliani and Sergeant Deborah Peters in their individual capacities.

2. The 70th Precinct serves a community that is 40% black, 38% white, 14.3% Hispanic and 6.9% Asian. *See* Letter of Jacob Silver, Staff Attorney, NYPD Legal Bureau to the Equal Employment Opportunity Commission ("EEOC"), January 30, 1998, Ex. K to the Joint Exhibits for Cross–Motions for Partial Summary Judgment. (All alphabetical exhibits refer to the Joint Exhibits for Cross–Motions for Partial Summary Judgment).

function fulfills a most fundamental obligation of government to its constituency.

*Foley v. Connelie*, 435 U.S. 291, 297, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (New York statute requiring U.S. citizenship for members of state police force did not violate the equal protection clause under rational relationship test). Moreover, the legal issues involved are singular. The legality of a municipal program to improve law enforcement efforts by adopting a race-conscious hiring or promotion program is typically challenged by white applicants alleging "reverse discrimination" in violation of the equal protection clause or Title VII. *See, e.g., Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir.1992) (white male denied acceptance in police recruit class challenged affirmative action plan that resulted in hiring of minority and female applicants with lower examination scores); *Peightal v. Metropolitan Dade County*, 940 F.2d 1394 (11th Cir.1991) (white male denied position as firefighter challenged affirmative action plan that resulted in hiring of 57 minority or female applicants with lower examination scores); *Fountain v. City of Waycross*, 701 F.Supp. 1570 (S.D.Ga.1988) (white officer ranked first on promotion list challenged affirmative action plan that was used to promote black officer ranked seventh). Here, however, minority plaintiffs allege that they were victimized by the NYPD's race-based transfer program, intended to improve police/community relations in minority neighborhoods.

## II. Background

On August 9, 1997, Abner Louima, a black man of Haitian national origin, suffered a brutal beating and sexual torture at the hands of several white police officers within the confines of the 70th Precinct station house in Brooklyn, New York. A meeting at New York City Police Headquarters was convened two days later in response to the incident. In attendance were Mayor Rudolph W. Giuliani, Police Commissioner Howard Safir, other police officials, members of the clergy and community leaders, including New York City Council Member Una S.T. Clarke. *See* Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶ 3. Councilwoman Clarke is the elected City Councilwoman from New York City's 40th District, Brooklyn. Her jurisdiction includes Precincts 67, 70 and 71. Following that meeting, Commissioner Safir decided to deploy more black police officers to the 70th Precinct. *See* Deposition of Commissioner Safir, February 5, 1999 ("Safir Dep."), Ex. A, at 54.

On August 12, reports of the Louima incident began to appear in the media. The next day, the first of several demonstrations, involving thousands of protestors, was held at the 70th Precinct. Defs.' 56.1 ¶ 9. Police and city officials became concerned that these demonstrations might result in violence. Defs.' 56.1 ¶¶ 10, 11. As a result, on August 14, five days after the Louima incident, Mayor Giuliani and Commissioner Safir publicly announced that the Commanding Officer and Executive Officers of the 70th Precinct, both of whom were white, as well as ten police officers assigned to that precinct, would be immediately reassigned. Defs.' 56.1 ¶ 12. In their place, Raymond Diaz, who is Hispanic, was quickly appointed Commanding Officer, and George Clouden, who is black, was named Captain. Defs.' 56.1 ¶ 12.

On August 16, seven days after the Louima incident, approximately ten or twelve police officers, of whom approximately half were black, were transferred into the 70th Precinct. Defs. 56.1 ¶ 14. On August 19, eight days after making the decision to transfer black officers into the precinct, Commissioner Safir announced that minority police officers would be transferred into the 70th Precinct, and that the City would recall the Haitian–American police officers who had been on a leave of absence to Haiti to help reform

the notoriously brutal Haitian police force. Defs.' 56.1 ¶ 16.[3] Also on the 19th, the Mayor created a Task Force on New York City Police/Community Relations. Defs.' 56.1 ¶ 17.

On August 25, two weeks after Commissioner Safir's decision to deploy black officers, approximately twenty-seven police officers within the Command known as Patrol Borough Brooklyn South—including all of the plaintiffs—were involuntarily transferred to the 70th Precinct. All twenty-two plaintiffs transferred on August 25 are black and identify themselves as African–American, Black–Hispanic, Jamaican, West–Indian, Trinidadian or Guyanese. Pls.' 56.1 ¶¶ 12–54.[4]

On August 29, a rally and demonstration protesting the Louima incident began at Grand Army Plaza in Brooklyn and continued over the Brooklyn Bridge to City Hall. Demonstration organizers notified police and city officials at least ten days in advance of their intention to hold the rally. Defs.' 56.1 ¶ 15. Following the rally, a number of individuals were arrested in Brooklyn and charged with disorderly conduct. Defs.' 56.1 ¶ 24. Demonstrations continued to occur outside the 70th Precinct station house for several days after the August 29 rally. Defs.' 56.1 ¶ 25. On October 23, 1997, less than one month after their involuntary transfer, plaintiffs filed the instant action.[5]

### III. Legal Standard for Summary Judgment

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See id.* The moving party has the burden of identifying the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). This is true even though the court is presented with cross-motions for summary judgment. Each movant has the burden of presenting evidence to support its motion. *See Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir.1988).

### IV. Discussion

#### A. Plaintiffs' Equal Protection Claim

■ The equal protection clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person

3. Commissioner Safir stated: "I think we need to move some more Haitian police officers into the Seven–O who can relate to that portion of the community that is Haitian." John Kifner, *Officers Assigned to Haiti Are to Join 70th Precinct*, N.Y. Times, August 20, 1997, B3, Ex. N. There are approximately 200 Haitian–American officers in the NYPD. *See* Deposition of Yvann Pierrelouis, Caribbean Liaison, NYPD Community Affairs Office, Sept. 17, 1998 ("Pierrelouis Dep."), Ex. H, at 9.

4. The NYPD transferred a total of 44 employees *into* the 70th Precinct between August 9, 1997 and September 19, 1997. Of those 44, 9 were supervisors and 35 were police officers. Of the supervisors, 4 are black, 4 are white

and one is Hispanic. Of the police officers, 27 are black, 2 are white and 6 are Hispanic. *See* Report of Investigating Officer Sergeant S.W. St. James, NYPD Office of Equal Employment Opportunity, Oct. 17, 1997, Ex. N, 1.

During that same period, a total of 24 transfers were made *out* of the 70th Precinct. Of those 24, 4 were white supervisors. Of the 20 police officers, one was black, 14 were white, 4 were Hispanic and one was Asian. *See id.* at 2.

5. Nine plaintiffs filed administrative charges with the EEOC shortly after their transfer and received right-to-sue letters. *See* Amended Complaint, Ex. Q, ¶¶ 10–16.

within its jurisdiction the equal protection of the laws." The individual rights guaranteed by the Fourteenth Amendment are not absolute; they must be balanced against the state's interest. "[W]hen a State's ... imposition of burdens hinges on ... the color of a person's skin, that individual is entitled to a demonstration that the challenged classification is necessary to promote a substantial state interest." *University of California Regents v. Bakke,* 438 U.S. 265, 320, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

■■■ Governmental classifications based on race are inherently suspect under the equal protection clause and subject to strict judicial scrutiny. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *Richmond v. J.A. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). To satisfy a strict scrutiny analysis, a race-based classification must promote a compelling governmental interest and be "narrowly tailored" to meet that interest. *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). Although race-based actions merit the highest judicial scrutiny, the Supreme Court has emphasized that it wishes "to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" *Adarand,* 515 U.S. at 237, 115 S.Ct. 2097 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring in judgment)). Accordingly, it is possible for a race-based classification to survive this standard of review.

### 1. "Operational Needs" May Constitute A Compelling State Interest

Defendants move for summary judgment on the issue of whether a police department's "operational needs" may constitute a compelling state interest.[6] Re-

solving the issue of whether such an "operational needs" defense is legally cognizable does not mean that the facts of this case automatically fall within any such defense. Indeed, the burden of proving whether the circumstances present in the 70th Precinct during August 1997 justify an operational needs defense rests with defendants.

The need to integrate a police force, under certain circumstances, can meet the compelling state interest requirement of the strict scrutiny test. Typically, a compelling governmental interest results from the need to remedy past discrimination by the police department. *See, e.g., Bridgeport Guardians v. Members of the Bridgeport Civil Serv. Comm'n,* 482 F.2d 1333, 1341 (2d Cir.1973) (approving hiring quotas for minority police officers on grounds of past discrimination and noting that "visibility of the Black patrolman in the community is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement"); *Detroit Police Officers' Assoc. v. Young,* 608 F.2d 671 (6th Cir.1979) (uncontroverted evidence of historical racial discrimination by police department justified voluntary affirmative action program). To succeed on a traditional "operational needs" defense, defendants must show a compelling governmental interest by establishing: (1) that discrimination against the black community has characterized law enforcement in the past; (2) that this discrimination has engendered hostility between black community members and the police; and (3) this hostility has made law enforcement in the community ineffective. *See Race as an Employment Qualification to Meet Police Department Operational Needs,* 54 N.Y.U. L.Rev. 413, 427 (1979) (hereinafter *"Race as an Employment Qualification"*). However, defendants here do not rely on the theory of

---

**6.** This argument is raised as a defense to plaintiffs' equal protection challenge, rather than as a defense to a Title VII violation. As discussed later in this Opinion, Title VII provides its own separate defenses which include exceptions for a bona fide occupational qualification and for affirmative action plans.

past discrimination to justify their operational needs defense.

Rather, relying on portions of Justice Lewis Powell's opinion in *Bakke*, defendants suggest that race-conscious decisions can survive strict scrutiny for reasons other than curing the ill effects of past discrimination. *See Bakke*, 438 U.S. at 313, 98 S.Ct. 2733 (goals of creating diverse student body and providing health care to underserved communities characterized as compelling governmental interests). Defendants argue that despite the absence of past discrimination, the NYPD's responsibility to reestablish effective law enforcement after it has been impaired by community hostility provides an equally compelling state interest. This particular issue is one of first impression in this Circuit. Courts in other circuits, however, have been willing to consider the need for effective law enforcement, absent evidence of past discrimination, as a sufficiently compelling governmental interest.

In *Wittmer v. Peters*, 87 F.3d 916 (7th Cir.1996), the Seventh Circuit held that a county prison's rejection of three white correctional officers, in favor of a black applicant, for the position of prison boot-camp lieutenant did not violate the equal protection clause. Instead of limiting the use of race-based hiring to curing the ill effects of past discrimination, the court found another compelling interest in hiring the black lieutenant:

> The black lieutenant is needed because inmates are believed unlikely to play the correctional game of brutal drill sergeant and brutalized recruit unless there are some blacks in authority in the camp. This is not just speculation, but is backed up by expert evidence that the plaintiffs did not rebut. The defendants' experts—recognized experts in the field of prison administration—did not rely on generalities about racial balance or diversity; did not, for that matter, defend a goal of racial balance. They opined that the boot camp in Greene County

would not succeed in its mission of pacification and reformation with as white a staff as it would have had if a black male had not been appointed to one of the lieutenant slots.

*Wittmer*, 87 F.3d at 920. *But see McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 444, 142 L.Ed.2d 398 (1998) (declining to extend compelling interest found in *Wittmer* to firefighting due to insufficient evidence that white firefighters may lack credibility and be denied cooperation in minority neighborhoods).

In *Talbert v. City of Richmond*, 648 F.2d 925, 931–932 (4th Cir.1981), the Fourth Circuit followed Justice Powell's analysis in *Bakke* and reversed a district court's finding that a police department's consideration of race in denying promotion to a white officer violated the equal protection clause. In *Talbert*, the City claimed that it used race as a factor in promoting minorities to the top ranks of the police department in order to "advance the operational needs of the police department by achieving diversity.... It viewed such diversity as important to effective law enforcement in a city whose population was approximately 50% black." *Talbert*, 648 F.2d at 928.

While the issue is one of first impression in this Circuit, the operational needs defense was alluded to, albeit in a different context, in *Barhold v. Rodriguez*, 863 F.2d 233, 238 (2d Cir.1988). There, the court noted in dicta that when statistical evidence appeared insufficient to support a history of past discrimination by the New York State Division of Parole, the district court could have considered a "second possible compelling state interest" that of an "operational need of the Division for a balanced workforce." *Id.* (citing *Talbert*, 648 F.2d at 928–29).[7] The Second Circuit defined "operational need" as "a law enforcement body's need to carry out its mission effectively, with a workforce that

---

7. Neither of the parties in *Barhold* effectively advanced an "operational needs" argument.

appears unbiased, is able to communicate with the public and is respected by the community it serves." *Barhold,* 863 F.2d at 238.

Here, defendants assert that the minority community's distrust of the NYPD was heightened by the Abner Louima incident and could have resulted in a collapse of the social order, such as the violence which erupted in Crown Heights following the murder of Yankel Rosenbaum[8] and in Los Angeles following the announcement of the verdict in the Rodney King case. The crux of defendants justification stems from a theory espoused in a law review article:

> A predominantly white police force may face a serious barrier to its law enforcement activities in the hostility of members of the black community. Black hostility toward the police may arise from distrust of the white establishment, whose power and authority the police symbolize; racist attitudes and practices by white police officers; or past discrimination by the municipality in the provision of law enforcement services to black residents. This hostility can be expressed in a variety of ways, from passive non-cooperation with police investigative efforts to active rejection of the rule of law; in its most extreme form, hostility can be manifested in mass rioting or widespread looting and random violence.

*Race as an Employment Qualification,* 54 N.Y.U. L.Rev. at 413–14. *See also,* National Advisory Comm'n on Civil Disorder, Report 9–11, 299 (New York Times ed.1978) (the "Kerner Commission") ("We have cited deep hostility between police and . . . communities as a primary cause of the disorders surveyed by the Commission. . . . [I]n practically every city that has experienced racial disruption since the summer of 1964—abrasive relationships between police and [blacks] have been a major source of grievance, tension and, ultimately, disorder.").

Based on this reasoning, defendants argue that there was an operational need to transfer white officers out of—and black officers into—the 70th Precinct to restore community confidence:

> [W]e discussed the issue that this was an emergency situation, that we believed and I believed that there was great potential for civil disturbance and we needed to very quickly and very expeditiously calm the community and make sure that the community understood that we took this incident very seriously, that we were not going to cover it up, that we were not going to let it go unnoticed and we were going to take very firm and decisive action.

Safir Dep. at 56–57.

Upon careful consideration, it is my conclusion that the need for effective law enforcement can be a compelling state interest. In order to carry out its mission effectively, a police force must appear to be unbiased, must be respected by the community it serves and must be able to communicate with the public. Thus, a police department's "operational needs" can be a compelling state interest which might justify race-based decision making. However, defendants bear the burden of proving at trial that this compelling state interest actually existed in light of the circumstances in the 70th Precinct during and after August 1997.[9] Thus, in order to

---

**8.** On August 19, 1991, in the Crown Heights neighborhood of Brooklyn, New York, a seven-year-old black child was killed when struck by an out-of-control automobile which was part of an entourage of Jewish community figures. Later that night, in an act of retaliation, a group of black youths stabbed and killed a Jewish man. Days of looting, arson and rioting followed. The NYPD did not transfer any Jewish officers into Crown Heights during that crisis, nor has it made

minority-based transfers during any other crisis. *See* Safir Dep. at 64.

**9.** Plaintiffs disagree that the potential for violence was as serious as that described by defendants. For example, there were no incidents of civil unrest in any demonstrations prior to August 29. *See* Safir Dep. at 73–75. "As far as I know, there were no physical injuries nor property damage. . . . If there were demonstrations, they were peaceful."

prevail on this defense, defendants must demonstrate, at trial, that community hostility towards the NYPD following the Louima incident compromised the goal of effective law enforcement and that race-based transfers would restore that goal.

**2. Whether Action Was "Narrowly Tailored" Remains Disputed Question of Fact Precluding Summary Judgment**

■ Once a compelling state interest has been established, defendants must satisfy the second prong of the strict scrutiny test by showing that the transfers were "narrowly tailored" to meet that interest. Plaintiffs now move for summary judgment on their equal protection claim, seeking a ruling that defendants' action was not narrowly tailored. Under the criteria set forth by the Supreme Court in *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1986), to determine whether a plan is narrowly tailored, a court must look to the "necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." Here, defendants must demonstrate that their decision to transfer officers because of their race was necessary to achieve a compelling state interest and that there was no less burdensome

alternative.[10] For example, in *Barhold,* the Court of Appeals agreed with the district court's conclusion that a New York State Parole Division affirmative action plan was narrowly tailored to achieve its goals of increasing female and minority representation. There, the Parole Division designed the plan

as a temporary measure; in fact, the Division modified it after only four months because of its effectiveness. The plan as modified is flexible, with affirmative action being only one of several factors that may be taken into consideration.... The plan does not set quotas.... Finally, the impact on third parties has not been excessive and the interests of White males have not been unnecessarily trammeled.

*Barhold,* 863 F.2d at 238.

**a. Flexibility and Duration**

■ Limiting the duration of a race-conscious remedy is a keystone of a narrowly tailored plan. *See, e.g., United Steelworkers v. Weber,* 443 U.S. 193, 215, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (program "operates as a temporary tool for remedying past discrimination"; "the duration of the program is finite") (Blackmun, J., concurring in judgment), *reh'g denied,* 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1979); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (citing *Fulli-*

Deposition of Michael Markman, Chief of Personnel Bureau, Jan. 21, 1999 ("Markman Dep."), Ex. E, 71; *see also* Community Affairs Worksheets of Officer Corlis Smith, Ex. M (reporting "no incidents" of community unrest despite presence of hundreds of demonstrators on Aug. 16, 17 and 23). On August 23, the newly-appointed 70th Precinct Commanding Officer Raymond Diaz noted that a "planned peaceful demonstration" of 100 persons occurred outside the 70th Precinct. A total of 258 officers were on hand. There were no arrests and "the group dispersed without incident." *See* Memorandum from C.O. Diaz to Chief of Patrol, Aug. 23, 1997, Ex. L. In fact, there were no arrests or violent incidents other than the arrests made during the August 29 march. On August 29, Community Affairs Officer Corlis Smith reported

that the demonstration attracted approximately 6,000 attendees. Of those, approximately 100 were arrested for "attempting to impede traffic." Worksheet, August 29, 1997, Ex. M.

**10.** Moreover, assuming that exigent circumstances immediately following the Louima incident provided a compelling state interest to justify the swift transfer of officers based on their race, defendants must then prove that once the emergency situation subsided, the continued presence of the transferred officers in the 70th Precinct remained necessary to achieve the purported compelling state interest and that there is no less burdensome alternative.

*love*, 448 U.S. at 480, 100 S.Ct. 2758); *Detroit Police Officers' Assoc. v. Young*, 989 F.2d 225, 228 (6th Cir.1993); 3 Lex K. Larson, *Employment Discrimination* § 63.06[3] (2d ed.1999) (hereinafter *"Larson"*). In the instant case, unless officers may request and obtain transfers out of the Precinct, the defendants' transfer decision is perpetual and inflexible, rather than of limited duration.

Defendants maintain that the transfers were not permanent and that any officer who desired a transfer elsewhere was free to make a request. Defendants argue that to the extent plaintiffs remain assigned to the 70th Precinct it is because they did not request a transfer. Those officers who did seek a transfer "were permitted to do so as long as the assignment they desired was available and appropriate." Defendants' Memorandum in Support of Motion for Partial Summary Judgment ("Defs.' Mem.") at 16. For example, plaintiff Oscar Espinal transferred out of the 70th Precinct within weeks of his involuntary transfer. In contrast, plaintiffs proffer evidence that they have not been afforded the opportunity to transfer out of the Precinct. *See* Pls.' 56.1 ¶ 116. According to plaintiffs, Officer Gary Johnson was advised by his commanding officer, Raymond Diaz, that he could not transfer out. *See* Affidavit of Plaintiff Gary Johnson, April 26, 1999 ("Johnson Aff."), Ex. X, ¶ 17. In addition, the Amended Complaint alleges that both officers Dave Guevera and Michael Butler requested a transfer out of the 70th Precinct, but their requests were either denied, not processed, or deleted. *See* Amended Compl., Ex. Q, ¶¶ 142, 152.[11] The ability of the officers to meaningfully request and receive transfers is a disputed issue of fact that must be resolved at trial.

**b. Efficacy of Alternative Remedies**

As for the efficacy of alternative remedies, defendants contend that during the crisis, the City did not have the time to implement other remedial programs such as race-conscious hiring or sensitivity training. The NYPD had, at most, two to three weeks to act before the rally planned for August 29 and the subsequent daily rallies. The crisis situation may have prevented the NYPD from conducting a thorough analysis of long-term strategies to improve community relations within the 70th Precinct. However, two years have now passed since the crisis both erupted and subsided. Plaintiffs argue that, in the interim, the City has had time to develop and implement other remedial actions such as race-based hiring or sensitivity training. Thus, it is not clear whether concerns for public safety continue to justify race-based involuntary transfers to the exclusion of other remedies.

More important, however, in considering the efficacy of the remedy, is plaintiffs' contention that the transfer decision could not have been narrowly tailored because the assignment of officers on the basis of their race, failed to satisfy the goals set out by the Police Commissioner. At his deposition, Safir specifically acknowledged the need for Creole-speaking officers who could be sensitive to the needs of the community. *See* Safir Dep. at 59–60; Pierrelouis Dep. at 12–13, 17–22. Safir advised the press and community members at Police Plaza that he intended to transfer Haitian police officers to the 70th Precinct. *See* Safir Dep. at 82. Although a list of Haitian and "Creole speaking" officers was available to the NYPD, Safir declined to transfer those individuals. *See* Safir Dep. at 60, Pierrelouis Dep. at 19–22. The ultimate transfer decision was based on race—not language skills, Haitian national origin, job skills or the sensitivity of any particular officers. *See* Safir Dep. at 83–88; Markman Dep. at 81–88.[12] In addition

---

11. Defendants also contend that their transfer decision was narrowly tailored because, in order to minimize disruption caused by extra commuting time, the transferred officers came from contiguous precincts within the command known as Patrol Borough Brooklyn South.

12. Plaintiffs question defendants' good faith in this and other respects, including the fact

to their race, plaintiff officers were chosen because they were "good" officers and tended to be more junior in status. *See* Deposition of Deputy Inspector Edward Hayes, January 13, 1999 ("Hayes Dep."), Ex. S, 19–20.

Indeed, Safir acknowledged that alternatives did exist. The NYPD could have immediately deployed black police officers or detectives to the 70th Precinct on a temporary basis within hours of the tragic event. *See* Safir Dep. at 78. For example, in response to the rioting in Crown Heights in August 1991, the NYPD immediately dispatched additional officers and community affairs assistants on a temporary basis. *See* Safir Dep. at 63–64. However, Chief Markman distinguished the Crown Heights incident, explaining that Crown Heights involved tension between the Jewish community and the black community, not tension between the community and the NYPD arising from an incident of white police violence against black victims. *See* Markman Dep. at 132. Similar to the issues of flexibility and duration, whether viable less-burdensome alternatives existed remains a disputed issue for the trier of fact.

Whether defendants' transfer decision was narrowly tailored requires the resolution of material issues of fact including those set forth above. Accordingly, plaintiffs' motion for partial summary judgment on this issue is denied.

## B. Plaintiffs' Title VII Claim

Title VII makes it unlawful for an employer to discriminate against any individual with respect to the "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e–2(a)(1). In addition, Title VII forbids an employer to "limit" or "segregate" its employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," because of such individual's race, color, or national origin. 42 U.S.C. § 2000e–2(a)(2). Plaintiffs' discrimination claim is based on a theory of disparate treatment, namely that in transferring black officers into the 70th Precinct on the basis of their race, defendants treated members of a protected class less favorably than white persons.[13]

Plaintiffs move for partial summary judgment on their Title VII claim, seeking to preclude defendants from asserting certain defenses to this claim. Defendants, in turn, cross-move for summary judgment on the Title VII claim, arguing that plaintiffs are unable to establish that their involuntary transfer constitutes an "adverse employment action" under Title VII.

## 1. Legal Analysis Applicable to Cases Involving Direct Evidence of Discrimination

■ Discriminatory treatment is established under Title VII when plaintiffs prove they were treated less favorably than others solely because of their race, color, religion, sex or national origin. "Proof of discriminatory motive is critical." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Motive can be established by circumstantial as well as direct evidence. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Normally, discriminatory treatment is proven pursuant to

---

that despite Safir's acknowledgment of an immediate need for the transfers, they did not occur until three weeks after his announcement. *See* Safir Dep. at 63.

**13.** Defendants take pains to note, and I agree, that this case is not one involving disparate impact. Disparate impact cases, as opposed

to disparate treatment cases, involve neutral employment policies that have the unintended effect of discriminating against individuals who belong to a protected class. *See, e.g., Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645–46, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

the three-part test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and elaborated upon in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under the *McDonnell Douglas/Burdine* framework, plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. Then, assuming the defendant articulates a non-discriminatory reason, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for the true motive which is discriminatory. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Defendants assert that plaintiffs have failed to establish a prima facie case.[14]

■ Where there is direct evidence that race was the motivating factor, "the *McDonnell Douglas* search for a motive is unnecessary and therefore inapplicable." *Johnson v. State of New York*, 49 F.3d 75, 79 (2d Cir.1995) (employer's mandatory age-dependent retirement policy constituted direct evidence that plaintiff's discharge was based on age) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). "As should be apparent, the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in judgment). *Price Waterhouse* advanced the following test applicable to cases of intentional discrimination where direct evidence is available. Once an employee has adduced direct evidence of disparate treatment on the basis of race, she has made out a prima facie case of intentional discrimination. The burden of persuasion then shifts from the employee to the employer, who must rebut the direct evidence of discrimination by affirmatively proving that it would have made the same decision even if it had not taken race into account. *See Price Waterhouse*, 490 U.S. at 242, 109 S.Ct. 1775 (plurality opinion). The test set out in *Price Waterhouse*, however, is also inapplicable because defendants concede that their decision was based on race and they would not have made the same decision absent race.

Despite defendants' concession that race was the motivating factor behind the employment action, the ultimate burden of proving a Title VII violation remains with the plaintiffs. That burden includes proving by a preponderance of the evidence, as in any other Title VII case, that plaintiffs' involuntary transfer constitutes an adverse employment action.

**2. Issue of Whether Transfer Was An Adverse Employment Action Precludes Summary Judgment**

Defendants argue that plaintiffs' transfer cannot, as a matter of law, constitute an adverse employment action because plaintiffs' rank, salary, benefits and duties were the same both before and after the transfer.

**a. What Constitutes An "Adverse Employment Action"**

As set forth above, Title VII prohibits employers from discriminating with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's ... race, ... or to limit, segregate, or classify [its] employees ... in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... race." 42 U.S.C. § 2000e–2(a). Accord-

**14.** Defendants back away from this assertion in their reply brief, stating that the *McDonnell Douglas* analysis "has little application in this matter". Defendants' Reply Memorandum in Support of Motion for Partial Summary Judgment ("Defs.' Reply Mem.") at 4.

ingly, our Court of Appeals has held that the plain language of the statute makes abundantly clear that "the protections provided by Title VII are not limited to 'instances of discrimination in pecuniary emoluments.'" *de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16, 21 (2d Cir.1996) (quoting *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir.1980)). "Recognizing that job discrimination may take many forms, Congress cast the prohibitions of Title VII broadly to include subtle distinctions in the terms and conditions of employment as well as gross salary differentials based on forbidden classifications." *Rodriguez*, 620 F.2d at 364.

Indeed, the Second Circuit has found that lateral transfers, without any resulting loss of salary, may constitute an adverse employment action for the purposes of Title VII. In *de la Cruz*, for example, plaintiff's lateral transfer from the Department of Social Service's Adoption Unit to the Foster Care Unit constituted an adverse action sufficient to satisfy plaintiff's prima facie case of national origin discrimination and to prevent summary judgment in favor of his employer. Plaintiff de la Cruz contended that his employer

> moved him from an "elite" division of DSS, which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth. [Defendants] argue that the two units are equal in status. Although de la Cruz's case is in this respect quite thin, the transfer arguably altered the terms and conditions of his employment in a negative way.

*de la Cruz*, 82 F.3d at 21. Similarly, in *Rodriguez*, the Second Circuit reversed the dismissal of a Title VII action brought by a junior high school art teacher who had been involuntarily transferred to an elementary school in the same school system. Her employer maintained that the transfer would "not diminish her salary; does not and will not reduce her benefits, her seniority rights, or add any increased

load to her work performance. The difference is in the site of her work and the age of her pupils." *Rodriguez*, 620 F.2d at 365. Rodriguez, however, contended that the transfer decision was motivated by her sex and effectively represented "a demotion that would constitute a serious professional setback and stigma to her career." *Id.* The District Court sided with the employer stating that the teacher's action "cannot survive dismissal merely because plaintiff seeks to assuage hurt feelings and injured pride." *Id.* In reversing, the Second Circuit noted the district court's recognition that the transfer caused plaintiff "severe professional ... trauma" due to the profound difference in art programs geared to students in elementary school as opposed to junior high school. "This radical change in the nature of the work Dr. Rodriguez was called upon to perform constitutes interference with a condition or privilege of employment adversely affecting her status within the meaning of the statute." *Id.* at 366.

"Adverse actions include a decision that 'has an attendant negative result, a deprivation of a position or an opportunity.'" *Meckenberg v. New York City Off-Track Betting*, 42 F.Supp.2d 359, 377 (S.D.N.Y. 1999) (female employee's subjective dissatisfaction alone does not render denial of requested transfer legally cognizable adverse employment action under Title VII; however, issue of fact regarding whether working conditions were objectively unfavorable would preclude summary judgment) (quoting *Medwid v. Baker*, 752 F.Supp. 125, 136–37 (S.D.N.Y.1990) (whether plaintiff's transfer to identical position out-of-state was adverse employment action under ADEA precluded summary judgment in favor of employer; plaintiff alleged that transfer posed undue hardship on family and resulted in diminution in work assignments)); *see also Sprott v. Franco, Chair New York City Hous. Auth.*, 94 Civ. 3818, 1997 WL 79813, *13 (S.D.N.Y. Feb. 25, 1997) (issue of fact whether plaintiff's transfer was adverse

employment action; because "[e]ven if a transfer does not result in a reduction in salary, benefits, or civil service rank, it may be considered adverse when the employer moves the employee's office to an undesirable location") (citing *Monica v. New York City Off–Track Betting*, 93 Civ. 6371, 1995 WL 117879, *4 (Mar. 20, 1995), *aff'd*, 100 F.3d 941 (2d Cir.1996)).

Nevertheless, "not every unpleasant matter short of [discharge or demotion] constitutes an adverse employment action." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (quoting *Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir.1994)); *see also Garber v. New York City Police Dep't*, 95 Civ. 2516, 1997 WL 525396, *7 (S.D.N.Y. Aug. 22, 1997), *aff'd*, 97–9191, 1998 WL 514222, *3 (2d Cir. June 12, 1998) (plaintiff's subjective "unhappiness" over transfer decision not enough to constitute adverse employment action); *Bunis v. Runyon*, 94 Civ.2063, 1997 WL 639241, *3–4 (S.D.N.Y. Oct. 16, 1997) (plaintiff's subjective feelings about denial of shift-change request not enough to transform denial into adverse employment action within meaning of Title VII). *See also Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) ("Obviously, a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do either.").

■ "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse'." *Wanamaker*, 108 F.3d at 466. In addition, because job discrimination can take many forms, courts are not limited as to the job conditions that may be considered in determining whether a particular employment action is materially adverse. *See,*

*e.g., Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) (suggesting non-exclusive list of factors and noting that courts should consider "other indices that might be unique to a particular situation"). The key inquiry regarding involuntary transfers is whether the transfer constitutes a "negative employment action tantamount to a demotion." 1 *Larson* § 12.08[2] at 12–82 (citing *Keeley v. Citibank*, 711 F.Supp. 157 (S.D.N.Y.1989) (factual dispute as to whether transfer was a demotion precluded summary judgment)).

### b. Facts At Issue

■ Plaintiffs acknowledge that their positions in the 70th Precinct are essentially the same as their previous positions with respect to job responsibilities and compensation.[15] *See* Johnson Aff. ¶ 6. Plaintiffs do complain, however, that their status as officers has been lowered by placement both in a new Precinct and in this particular Precinct. First, plaintiffs allege that transfer to a new Precinct is akin to "starting over" as an officer, resulting in lost promotion opportunities. While some plaintiffs were rookies at the time of the transfer, others had been officers for between five and twelve years. *See id.* ¶ 18. The officers allege that their long-term professional relationships in their previous precincts would have played an important role in receiving future promotions or details. *See id.* ¶ 14. These opportunities were severed by placement in a new precinct.

Second, the officers allege that they are disadvantaged by their placement in the 70th Precinct. According to plaintiffs, the 70th Precinct is reputed to be a hostile and difficult environment; it is "frowned upon" by other officers, it faces more public and internal affairs scrutiny than other precincts and it has been the subject of many civilian complaints. *See id.* ¶¶ 15, 16. In

---

**15.** Seemingly in contrast to this acknowledgment, however, plaintiffs claim that they have received unfair assignments, placements in details and foot posts. *See* Pls.' 56.1 ¶ 115. Defendants contest this assertion. *See* Defs.' 56.1 ¶ 5.

addition, plaintiffs allege that since the station-house torture of Abner Louima, there appears to be a lack of respect among members of the community for police officers serving that jurisdiction. *See* Deposition of Plaintiff Robin Irvin, December 9, 1998, Ex. T, at 157. This lack of respect leads some plaintiffs to fear for the safety of themselves and their families. For example, one officer who resides on the border of the 70th Precinct fears reprisals from the people he has arrested.

In a somewhat analogous case involving only circumstantial evidence of race-based assignments, a judge found after a bench trial that a police department discriminated on the basis of race in violation of Title VII in its geographical assignment of police officers within the eighteen sectors of the City of Bridgeport. *See Bridgeport Guardians, Inc. v. Delmonte,* 553 F.Supp. 601, 611 (D.Conn.1983). Statistical evidence of those eighteen sectors demonstrated that black and Hispanic officers were disproportionately assigned to low-income, densely populated, high-crime, high-risk areas of the city where "[i]t goes without saying that [they] experience a heavier workload as well as greater danger and stress than [their white counterparts] assigned to more affluent, lower-crime areas of the city." *Id.* at 610.[16] The officers received the same pay and benefits regardless of their geographic location. Defendants' only explanation for this statistical disparity was "a vague reference" that officers are assigned "according to the relative importance that they may have in different types of neighborhoods." *Id.* at 611. In holding for plaintiffs, the court

stated: "Insofar as that reference is an oblique way of explaining that officers are matched by race to the racial composition of a sector, such a rationale is not a valid reason for the disparate pattern of work assignments." *Id.* (citing *Knight v. Nassau County Civil Serv. Comm'n,* 649 F.2d 157, 162 (2d·Cir.1981) (invalidating rationale "based on a racial stereotype that blacks work better with blacks and [ ] the premise that [an employee's] race [is] directly related to his ability to do the job")).

Although plaintiffs here have not alleged that the geographic area comprising the 70th Precinct has a higher-crime rate,[17] they do believe that this assignment presents greater personal risks. If this fear is merely subjective rather than objective, it cannot alone constitute an adverse employment action. Nevertheless, when combined with the loss of promotion opportunities and "good-will" accrued among supervisors in their former precincts, plaintiffs have made allegations which, if credited by the trier of fact, are sufficient to constitute an adverse employment action.

Thus, although defendants, who bear the burden of showing that there are no genuine issues of material fact, maintain that the officers continue to perform the same jobs, at the same salary, and in a location that is, for the most part, contiguous with their previous work locations, plaintiffs have raised, within the unique circumstances of this case, disputed issues of fact regarding the conditions of their new assignment which precludes summary judgment.[18] Whether and to what extent the

---

**16.** While the Court never explicitly addressed the element of an adverse employment action, it implicitly found that assigning minority officers to low-income, densely populated, high-crime, high-risk areas of the city, and the resulting increase in workload and stress, amounted to an adverse employment action.

**17.** However, former Chief of Patrol Wilbur Chapman testified that the 70th Precinct is a less desirable precinct than others because it is a "high incident" precinct. *See* Deposition of Wilbur Chapman, January 11, 1999

("Chapman Dep."), Ex. E, 56–57. Because of its "population, because of the quality of life, because of narcotics issues," the 70th Precinct is "busier" than others. "There's a lot of work there." *Id.*

**18.** The police department has been described as a paramilitary organization. As such, an employee must serve where he or she is assigned. Although an officer may request a transfer to another precinct, there is no guarantee that her request will be granted. Were race not the basis for the assignment, plain-

transfers have harmed plaintiffs is a question for the finder of fact.

### 3. Defenses Available Under Title VII

#### a. Bona Fide Occupational Qualification Exception

■ Plaintiffs move for partial summary judgment on the issue of whether the bona fide occupational qualification ("BFOQ") exception to Title VII provides defendants with an affirmative defense. Under Title VII, several affirmative defenses are available to employers who do not deny a claim of disparate treatment. The primary affirmative defense provided by Title VII in a disparate treatment case is the BFOQ:[19]

> [I]t shall not be an unlawful employment practice for an employer to *hire and employ [an] employee[ ]* ... on the basis of his *religion, sex, or national origin* in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....

42 U.S.C. § 2000e–2(e)(1) (emphasis added). The BFOQ exception is quite narrow. It only applies to the "hire and employ" of employees and, most significantly, it does not apply to discrimination based on race or color. *See, e.g., Knight,* 649 F.2d at 157 (involuntary assignment of black personnel specialist to minority recruitment position based on employer's belief that plaintiff would develop "better rapport" than white person with members of minority groups was neither permissible BFOQ nor affirmative action plan). The legislative history of Title VII indicates that this exclusion of race was not an oversight, but an intentional prohibition. *See* 110 Cong. Rec. 2550, 7215–18, 13825 (1964) (both House and Senate rejected proposed amendments to Title VII that would have included race as a permissible occupational qualification).

Despite the statutory bar to a BFOQ defense in race discrimination cases, defendants contend that courts may craft a narrow "judicial BFOQ" for race.[20] Indeed, defendants posit that the Seventh Circuit adopted such an exception in *Wittmer* finding that a preference for a black lieutenant for black prison boot camp inmates did not violate equal protection. In *Wittmer,* however, the Seventh Circuit applied a strict scrutiny test to determine that the hiring of a black lieutenant was narrowly tailored to meet a compelling state interest. The *Wittmer* court did not employ or address whether race could ever be a BFOQ under Title VII. While some courts have suggested in dicta that a racial BFOQ defense may be justified in limited circumstances, *see, e.g., Baker v. City of St. Petersburg,* 400 F.2d 294, 301 n. 10 (5th Cir.1968) (court suggested that special plainclothes assignments of black officers might be justified either to infiltrate a black criminal organization or "during brief periods of unusually high racial tension"), no court has actually approved of a race-based BFOQ. *See, e.g., Ferrill v. Parker Group, Inc.,* 168 F.3d 468 (11th Cir.1999) (declining to recognize race BFOQ exception and holding affirmative action defense unavailable to telephone marketing company uti-

---

tiffs could not challenge a decision to assign them to a more "dangerous" precinct.

**19.** Another statutory defense provided by Title VII, that of good faith reliance on a written interpretation and opinion of the EEOC, is not relevant here. *See* 42 U.S.C. § 2000e–12(b).

**20.** To the extent that defendants couch their defense as a "business necessity" as opposed to a BFOQ, the distinction is irrelevant. *See, e.g., Levin v. Delta Air Lines,* 730 F.2d 994,

997 (5th Cir.1984); 1 *Larson* § 11.02[3] at 11–10 to 11–11. An employer may assert a business necessity defense to claims that facially neutral employment practices have a discriminatory impact. *See* 42 U.S.C. § 2000e–2(k) (codifying judicially created exception of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). However, this defense is only available where the challenged employment practice is facially neutral.

lizing race-matched calling in get-out-the vote campaign).

Accordingly, plaintiffs' motion to preclude defendants from offering a racial BFOQ defense is granted. Plaintiffs, of course, maintain the burden of proving their Title VII claim.

### b. Valid Affirmative Action Plan

Courts have recognized another defense available to employers defending race-based employment actions on the ground that the employer was complying with a valid "affirmative action" plan. *See* 1 *Larson* § 11.04. In considering the validity of an employer's voluntary affirmative action plan, courts look to "whether there is a history of discrimination resulting in a workforce imbalance, whether the plan is temporary in nature, whether it is narrowly tailored to correct the imbalance, and the extent to which it affects the rights of third parties." 1 *Larson* § 11.04 at 11–17. Reliance on an affirmative action plan is not technically an affirmative defense, and the burden of proof rests with the plaintiffs to show the invalidity of the plan. *See Johnson v. Transport. Agency,* 480 U.S. 616, 627, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).

Plaintiffs argue that the transfers were not based on an "affirmative action plan". However, defendants argue that "under the aegis of 'affirmative action,' employers may engage in disparate treatment in favor of a protected class for the purpose of remedying past discrimination." *See* Defs.' Reply Mem. at 6 n. 7. According to Commissioner Safir, the NYPD "makes its best efforts to reflect the diversity of the communities it serves." Safir Dep. at 28. This policy stems from a "management judgment based on the fact that communities very often request and find it easier to communicate with individuals who look like them." *Id.* at 29; Defs.' 56.1 ¶ 10. Defendants testified that in keeping with long-time recommendations regarding police management, it was their usual practice to place minorities in particular

precincts because of their race and language skills. *See* Markman Dep. at 57–58, 61; Safir Dep. at 28–29. For example, the NYPD attempts to assign Chinese-speaking officers to Chinatown, Russian-speaking officers to Brighton Beach and Spanish-speaking officers to Washington Heights. *See* Markman Dep. at 79–80, 83. Nevertheless, Safir acknowledges that not all black police officers are alike: not all black police officers are necessarily sensitive to the needs of the black community; and some white officers might be sensitive to the black community. *See* Safir Dep. at 33, 38.

Plaintiffs are not challenging defendants' policy of achieving a racial and ethnic composition of the police force reflecting that of the community. Rather, the issue is whether the involuntary transfer of a group of officers because of their race and not their language skills, constitutes a "valid affirmative action program", or whether it constitutes an adverse employment action with respect to plaintiffs who may remain permanently disadvantaged by that action.

The valid affirmative action plan exception to Title VII is available to remedy "a history of discrimination resulting in a workforce imbalance." 1 *Larson* § 11.04 at 11–17. Unlike typical cases involving affirmative action plans, there is no suggestion that City or police officials are seeking to remedy past discrimination resulting in a workforce imbalance. Indeed, defendants do not concede that they ever discriminated and are not seeking to remedy past discrimination. Rather, defendants appear to be remedying past discrimination by the police *against the community.* This is not an appropriate basis for an affirmative action plan as aptly stated in *Knight.* Similar to the transfer decision in *Knight,* the transfer decision here appears to be

> based on a racial stereotype that blacks work better with blacks and on the premise that [the officers'] race was directly related to [their] ability to do the

job. No matter how laudable [defendants'] intention might be ... the fact remains that [the officers] were assigned a particular job (against [their] wishes) because [their] race was believed to specially qualify [them] for the work. This is a violation of Title VII.

*Knight*, 649 F.2d at 162. In short, an affirmative action exception to plaintiffs' Title VII claim is inappropriate and defendants are preluded from raising such a defense.

## V. Conclusion

For the foregoing reasons, defendants' motion for partial summary judgment on the equal protection claim as to whether law enforcement's "operational needs" may constitute a compelling state interest is granted. However, defendants bear the burden of proving at trial that such an "operational needs" defense fits the circumstances of this case. Defendants' motion for summary judgment on the Title VII claim based on plaintiffs' failure to offer proof of an adverse employment action is denied. Plaintiffs' motion for summary judgment on their equal protection claim on the ground that the decision to transfer them was not narrowly tailored to meet a compelling state interest is denied. Plaintiffs' motion for partial summary judgment on their Title VII claim to preclude defendants from raising a BFOQ or affirmative action defense to their Title VII claim is granted. A conference is scheduled for October 1, 1999 at 4:30 p.m.